Commonwealth *v.* Cano, Appellants.

526

Argued November 17, 1956. Before Rhodes, P.J., Hirt, Gunther, and Carr, JJ. (Wright, Woodside, and Ervin, JJ. absent).

*John E. Lavelle,* with him *Alvin E. Maurer, Jr., John J. Curran,* and *Curran & Lavelle,* for appellants.

*Donald D. Dolbin,* with him *Thomas Noonan, Leon Ehrlich,* Deputy Attorney General, and *Herbert B. Cohen,* Attorney General, for appellee.

OPINION BY RHODES, P.J., December 28, 1956:

Aurelio Cano and Charles Martin, defendants, were convicted and sentenced in the Court of Quarter Sessions of Schuylkill County for violation of the Anthracite Mine Law, Act of June 2, 1891, P. L. 176, as amended, 52 PS §71 et seq. They have appealed to this Court.

The defendants were arrested on a warrant issued by President Judge PALMER on August 1, 1952, as a result of an affidavit filed by an anthracite mine inspector pursuant to Article XVII, §1 of the Law, 52 PS §511, charging them with being negligently guilty of thirteen violations of the Law. There was no presentment to or indictment by the grand jury as the procedure in the Law provided otherwise. The prosecution arose out of an occurrence in defendants' mine on March 27, 1952, in which five miners lost their lives when the mine was flooded from adjacent workings. Defendants were not charged in these proceedings with any crime directly related to the deaths.

Defendants objected to the proceeding on constitutional grounds. Upon dismissal of their objections they demanded a jury trial under the provisions of the Law, 52 PS §511; in due course they were brought to trial before Judge DALTON. At the trial a demurrer

was sustained as to the corporate defendant, Cano and Martin, Inc. The ninth count in the information was dismissed at the request of the Commonwealth. The twelve counts or charges remaining against defendants were submitted to the jury. They were acquitted on seven counts and convicted on five counts. Motions in arrest of judgment and for a new trial were filed. The court in banc refused the motion for a new trial as to all counts in the information, but granted the motion in arrest of judgment on the first count. On each of the four counts remaining (2d, 7th, 10th, and 12th) defendants were sentenced to the maximum penalty of a $500 fine and three months in the county prison, 52 PS §511, or a total fine of $2,000 and one year in the county prison. Appeals having been taken to this Court, a supersedeas was granted by the court below over the objection of the trial judge who was of the opinion that the records of these defendants indicated that a supersedeas was unwarranted.

Defendants raise a number of questions on appeal. They relate to the constitutionality of the procedure, the refusal of their motion to poll the jury, the charge of the trial judge, the sufficiency of the evidence, and the rulings of the trial judge on the admissibility of certain evidence.

Defendants contend that the procedure which was followed—the filing of an affidavit charging them with violations of the Anthracite Mine Law, and the issuance of a warrant by the judge of the Court of Quarter Sessions of Schuylkill County, in accordance with Article XVII, §1, of the Law, 52 PS §511—violates Article I, §10 of the Constitution of this Commonwealth, PS Const. Art. I, §10, which provides: "No person shall, for any indictable offense, be proceeded against criminally by information, . . ." It is contended that the

absence of a bill of indictment by the grand jury renders the statutory procedure invalid.[1] The procedure by information in the sense that it is used in the Pennsylvania Constitution refers exclusively to practices formerly used in England whereby, upon information in the King's Court by some person, the accused was put on trial without further inquiry or investigation. *Com. ex rel. Stanton v. Francies*, 250 Pa. 496, 500, 501, 95 A. 527; *Com. ex rel. Wheeler v. Francies*, 58 Pa. Superior Ct. 266, 267; *Com. ex rel. Scasserra v. Maroney*, 179 Pa. Superior Ct. 150, 153, 115 A. 2d 912. The absence of an intervening indictment by the grand jury would render this procedure unconstitutional if the offenses for which these defendants were tried are "indictable offenses" within the meaning of the Constitution. *Com. v. Wadley*, 169 Pa. Superior Ct. 490, 493, 83 A. 2d 417. The Legislature cannot abolish the grand jury or remove this method of criminal procedure for "indictable offenses." *Com. v. Liebowitz*, 143 Pa. Superior Ct. 75, 80, 17 A. 2d 719; *Dauphin County Grand Jury Investigation Proceedings (No. 2)*, 332 Pa. 342, 353, 354, 357, 2 A. 2d 802. See, also, *Hartranft's Appeal*, 85 Pa. 433, 453, where, in a dissenting opinion, Chief Justice AGNEW stated that the grand jury is "one of the boasted bulwarks of English liberty handed down to us, and protected by the Declaration of Rights."

---

[1] Although we have the benefit of an extended brief on this question from defendants, counsel for the Commonwealth dismiss the issue with the erroneous assumption that the question is improperly raised because the defendants did not appeal from the preliminary order and decision dismissing the jurisdictional objection. The order dismissing this objection was interlocutory and not appealable at that time, but the question is now properly before us. See *Com. v. Wideman*, 150 Pa. Superior Ct. 524, 525, 526, 28 A. 2d 801; *Com. v. Trufley*, 170 Pa. Superior Ct. 200, 202, 85 A. 2d 622.

At common law the method of proceeding by information was not offensive generally, and an indictment by a grand jury was required only in cases involving capital crimes and felonies. "By the law of England, informations by the Attorney-General, without the intervention of a grand jury, were not allowed for capital crimes, nor for any felony, by which was understood any offense which at common law occasioned a total forfeiture of the offender's lands, or goods, or both. 4 Bl. Com. 94, 95, 310. The question whether the prosecution must be by indictment, or might be by information, thus depended upon the consequences to the convict himself." *Ex parte Wilson*, 114 U. S. 417, 423, 5 S. Ct. 935, 29 L. Ed. 89, 91. See 42 C.J.S., Indictments and Informations, §9, p. 837. It seems that, when this common law safeguard was recognized in the United States, it apparently assumed a greater area of protection. See 42 C.J.S., Indictments and Informations, §9(b), p. 838. The Pennsylvania Constitution and the constitutions of a number of states provide that proceedings by information are prohibited when the offense is an "indictable" offense. The Fifth Amendment to the Constitution of the United States provides: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, . . ." Although the language used in the Constitution of the United States and in the constitutions of various states, including Pennsylvania, could be interpreted as limiting their application to capital crimes and felonies as at common law they have not been so restricted. These provisions have been given a more extensive application, and the test generally applied in determining whether an indictment is necessary relates to the extent of the punishment which may be imposed. It has been held in Kentucky,

under a constitutional provision virtually the same as in Pennsylvania, that the term "indictable offense" refers to common law and statutory offenses, the punishments for which are "infamous," such as death or imprisonment in a penitentiary as distinguished from imprisonment in a county jail. *Perry v. Bingham*, 265 Ky. 133, 95 S. W. 2d 1099, 1100, 1101; *Lakes v. Goodloe*, 195 Ky. 240, 242 S. W. 632, 639, 640. This is similar to the test under the Federal Constitution which is whether the accused is made subject to punishment by imprisonment in a penitentiary or at hard labor. See *Brede v. Powers*, 263 U. S. 4, 44 S. Ct. 8, 68 L. Ed. 132; *Mackin v. United States*, 117 U. S. 348, 350, 351, 6 S. Ct. 777, 29 L. Ed. 909, 910, 911; *Ex parte Wilson*, supra, 114 U. S. 417, 423, 5 S. Ct. 935, 29 L. Ed. 89, 91. A statutory crime which is punishable by imprisonment at hard labor or by a fine is considered infamous because imprisonment may be imposed. *United States v. Moreland*, 258 U. S. 433, 42 S. Ct. 368, 66 L. Ed. 700. It will be observed that the controlling consideration under the federal rule is imprisonment in a penitentiary or at hard labor.

Our decisions indicate that the provision of Article I, §10, of the Pennsylvania Constitution was not intended to be limited to capital offenses and felonies, but that it applies also to the more serious indictable common law misdemeanors and statutory misdemeanors which the Legislature intends should be indictable. *Mansfield's Case*, 22 Pa. Superior Ct. 224, 234; *Mountain v. Com.*, 68 Pa. Superior Ct. 100, 102; *Allen v. Com.*, 77 Pa. Superior Ct. 244, 246, 247; *Com. ex rel. City of Pittsburgh v. Heiman*, 127 Pa. Superior Ct. 1, 9, 10, 190 A. 479; *Com. ex rel. Marsh v. Lindsey*, 130 Pa. Superior Ct. 448, 450, 451, 198 A. 512.

Defendants argue that the offenses charged under the Anthracite Mine Law were offenses which could have been punished at common law under the rule of *Com. v. McHale,* 97 Pa. 397, 408. In the latter case the Supreme Court said that the test for determining which offenses are indictable in Pennsylvania as common law offenses is not whether the precise definition of the crime can be found in the English texts or reported cases, but rather whether the offenses presently charged might have been punished at common law. It is there stated (page 408 of 97 Pa.) : "What is a common law offence? The highest authority upon this point is Blackstone. In chap. 13, of vol. 4, of Sharswood's edition, it is thus defined: 'The last species of offences which especially affect the Commonwealth are those against the public [peace] . . . or economy. By the public [peace] . . . and economy I mean the due regulation and domestic order of the kingdom, whereby the individuals of the state, like members of a well-governed family, are bound to conform their general behavior to the rules of propriety, good neighborhood and good manners, and to be decent, industrious and inoffensive in their respective stations. This head of offences must therefore be very miscellaneous, as it *comprises all such crimes as especially affect public society,* and are not comprehended under any of the four preceding series. These amount some of them to felony, and others to misdemeanors only.' " The Supreme Court then held that the making of false and fraudulent entries in a book of voters, the depositing of false and fraudulent ballots, and the false and fraudulent counting of ballots at an election were indictable as common law offenses under this rule. There have been other instances in which conduct was indictable as a common law offense in the absence of specific common law

precedent or statutory declaration.[2] In the *McHale* and subsequent cases, the inquiry whether the conduct amounted to a common law offense under this miscellaneous category was for the purpose of determining whether the Commonwealth was empowered to prosecute the accused for such conduct. See The Penal Code, June 24, 1939, P. L. 872, §1101, 18 PS §5101. Here the inquiry is whether a statutory offense is "indictable" within the meaning of the constitutional provision. An offense may come within the McHale rule of common law offenses and still not be indictable, as not all offenses were indictable at common law. *Ex parte Wilson*, supra, 114 U. S. 417, 423, 5 S. Ct. 935, 29 L. Ed. 89, 91. Summary proceedings were also recognized at common law; and, while some petty offenses might conceivably fall within the broad miscellaneous category of the McHale rule, they may nevertheless be properly prosecuted without an indictment. See *Com. ex rel. City of Pittsburgh v. Heiman*, supra, 127 Pa. Superior Ct. 1, 7, 10, 190 A. 479. If there is no specific common law or statutory procedure established for an offense which comes within the McHale rule, the Commonwealth is permitted to proceed in the usual manner, that is, by indictment. It is one thing to say that an indictment may lie in the absence of a specific common law or statutory procedure and another thing to say that the constitution requires such an indictment. See 42 C.J.S., Indictments and Informations, §§8, 9,

---

[2] For example, see the following cases: *Com. v. Mochan*, 177 Pa. Superior Ct. 454, 457, 458, 110 A. 2d 788 (numerous telephone calls to a married woman soliciting adultery, suggesting sodomy, and using vile language) ; *Com. v. DeGrange*, 97 Pa. Superior Ct. 181, 186 (indecent assault, because: " 'Whatever openly outrages decency and is injurious to public morals is a misdemeanor at common law' ") ; *Com. v. Flaherty*, 25 Pa. Superior Ct. 490, 492, 493 (attempt to commit larceny).

p. 837; 1 Wharton's Criminal Law, 12th Ed., §30, p. 47; *Com. ex rel. Barr v. Naylor*, 34 Pa. 86, 89.

Moreover, we do not agree with defendants' contention that the charges against them, in the absence of the statute, would have been indictable as common law offenses. Defendants were charged and tried under Article XVII, §1 of the Law, 52 PS §511, for having been "negligently guilty of an offense against the provisions of this act, whereby a dangerous accident had resulted or might have resulted to any person or persons employed in such mine . . ." The four alleged violations, of which they were convicted and for which they were sentenced, relate to the following: (1) Failure to take the precautions prescribed by rule 15 of Article XII of the Law, as amended, 52 PS §286, when approaching inaccessible workings which were likely to contain water or gas (second count); (2) failure to provide an efficient brake on every drum for lowering or raising persons or materials in the mine, as required by Article IV, §14 of the Law, 52 PS §356 (seventh count); (3) failure to send reports of air measurements in the mine to the mine inspector, as required by Article X, §16 of the Law, 52 PS §564 (tenth count); and (4) improper and unsafe storage of explosives used in the mine contrary to rule 26 of Article XII of the Law, 52 PS §421 (twelfth count). We think it is obvious that these offenses are not within the McHale definition of common law offenses. Except as such conduct has been prohibited by this statute, they do not offend against the public peace, morals, or economy, or the due regulation and domestic order of the Commonwealth. Although the Legislature, under the valid exercise of its police power, did regulate the business of mining by this statute for the safety of miners, it is only by virtue of the statute that

the failure to act in accordance therewith is made a punishable offense. The conduct of defendants was not necessarily offensive in itself, and in our judgment it would not have been so at common law.[3] The conduct regulated by the statute is not similar to that in the *McHale* or subsequent cases. In *Com. v. McHale,* supra, 97 Pa. 397, there was fraud, in *Com. v. Mochan,* 177 Pa. Superior Ct. 454, 110 A. 2d 788, and *Com. v. DeGrange,* 97 Pa. Superior Ct. 181, there were lewd, immoral, and indecent acts, and in *Com. v. Flaherty,* 25 Pa. Superior Ct. 490, there was an attempt to commit larceny which is a crime. If the contention of defendants is correct and the McHale rule is given such a broad interpretation, it would follow that nearly every newly created statutory offense would have to be considered a common law offense. As we view it this is not the scope of the McHale rule. It is applicable only to such conduct which is inherently offensive to the public peace, morals, and economy, and not to that which is within the power of the Legislature to prescribe as new crimes. See 1 Wharton's Criminal Law, 12th Ed., §28, p. 43; 22 C.J.S., Criminal Law, §8, p. 58. The Legislature has the power to prescribe new offenses and provide penalties therefor, and it may set forth the procedure by which a person charged with the commission thereof may be tried and his guilt or inno-

---

[3] Defendants refer to several English cases where persons charged with duties in and about mines were indicted for manslaughter when they were criminally negligent in those duties and persons were killed. That is distinguishable from the present situation. Defendants here are not on trial for manslaughter as a result of the deaths of the five miners killed in the flood, but for the lesser crime of violating the statutory regulations, the punishment for which is no more than a $500 fine or imprisonment in the county jail for three months or both. See *Allen v. Com.,* 77 Pa. Superior Ct. 244, 247.

cence determined. It may do this without the new statutory offense necessarily taking on the attributes of a common law offense and becoming thereby indictable within the meaning of the constitutional provision.[4] *Van Swartow v. Com.*, 24 Pa. 131, 133, 134; *Allen v. Com.*, 77 Pa. Superior Ct. 244, 247. Cf. *Com. ex rel. City of Pittsburgh v. Heiman,* supra, 127 Pa. Superior Ct. 1, 6 10, 190 A. 479. As we have said, summary proceedings were recognized at common law, and the Legislature may provide this means of prosecution when it considers the offense created of a petty nature or of lesser gravity than an indictable offense. See *Duke v. United States,* 301 U. S. 492, 495, 57 S. Ct. 835, 81 L. Ed. 1243, 1245. The error in defendants' contention is not only in giving a broad interpretation to the McHale rule and making it applicable to almost every newly created offense which may be connected in some way with the public peace, morals, or economy, but also in extending the rule so that every offense which may be said to fit that broad definition is of necessity an indictable offense.

The fact that the Legislature declared the violations with which defendants are charged to be misdemeanors (52 PS §514) does not make them indictable offenses.

---

[4] The following cases relate to the validity of statutory offenses for which the Legislature prescribed summary procedures without the intervention of a grand jury: *Allen v. Com.*, 77 Pa. Superior Ct. 244, 247 (cruelty to animals); *Com. ex rel. Marsh v. Lindsey*, 130 Pa. Superior Ct. 448, 450, 451, 198 A. 512 (compulsory school attendance); *Van Swartow v. Com.*, 24 Pa. 131, 133, 134 (prohibiting sale of spiritous liquors on the Sabbath, an offense which the court stated was "not a suit at common law, but a criminal proceeding under a special statute"); *Com. v. Waldman*, 140 Pa. 89, 21 A. 248 (performing worldly employment on the Sabbath); *Com. v. Mecca Cooperative Co.*, 60 Pa. Superior Ct. 314, 317 (regulating hours and conditions of employment of minor females).

The Legislature indicated its intention in this respect by providing a special procedure for prosecution of these offenses. It is true that the general and customary meaning of the word misdemeanor is an indictable offense not amounting to a felony (*Com. ex rel. Marsh v. Lindsey*, supra, 130 Pa. Superior Ct. 448, 450, 198 A. 512), but the use of the term misdemeanor may also include offenses not punishable by indictment. "But if it be true that the word [misdemeanor] includes all indictable offenses below the grade of felony, it does not follow it may not with propriety be used by the legislature to designate a class of petty offenses not known to the common law, and not necessarily indictable." *Allen v. Com.*, supra, 77 Pa. Superior Ct. 244, 248. See, also, *Com. v. Mecca Cooperative Co.*, 60 Pa. Superior Ct. 314, 317, where a summary offense was likewise designated by the Legislature as a misdemeanor. The Legislature here, as in the *Allen* and *Mecca* cases, although designating the offenses involved misdemeanors, clearly indicated that they were not of sufficient severity to be indictable; the punishment is by fine or simple imprisonment in the county prison for three months or both. In other sections of the Law (i.e., Article I, §1, as amended, 52 PS §71), the Legislature provided summary conviction as the method of enforcement, although the summary offenses are included in the declaration that all offenses under the Law are misdemeanors (52 PS §514). With respect to violations punishable under Article XVII, §1, 52 PS §511, presently before us, the Legislature indicated that, when the violation involved negligence and was likely to cause a dangerous accident, the punishment should be greater and the prosecution should be conducted in conformity therewith. It thus provided for a trial in the court of quarter sessions and before a

jury if the defendants so desire. These statutory offenses were within the power of the Legislature to create. They were not crimes at common law. They are more serious than summary offenses, although they are not of the magnitude of indictable misdemeanors. See *Duke v. United States, supra,* 301 U. S. 492, 495, 57 S. Ct. 835, 81 L. Ed. 1243, 1245; *United States v. Sloan,* 31 F. Supp. 327; *United States v. Lomas,* 60 F. Supp. 198; *Falconi v. United States,* 6 Cir. 280 F. 766; *Kempe v. United States,* 8 Cir. 151 F. 2d 680.

The second question raised on behalf of defendants relates to the trial judge's refusal to permit a poll of the jury. When a motion to poll the jury is timely made by the Commonwealth or by a defendant it should be granted. *Com. v. Martin,* 379 Pa. 587, 592, 593, 109 A. 2d 325. The controversy in the instant case is whether the motion was made too late. The original transcript of the events at the trial was ambiguous in this respect. After objections were filed and a hearing held, the record was amended by the court below. In passing upon the allegation of defendants that the motion was timely under the circumstances, the court in its opinion said: "The original transcript of testimony failed to show the motion, although it did refer to a discussion at side-bar between the trial judge and one of counsel for defendants, at the conclusion of which the trial judge said: 'Your motion comes after the jury has been dismissed.' Objections were filed to the stenographer's transcript, whereupon a hearing was held pursuant to the Act of May 11, 1911, P. L. 279, Section 4, 12 P.S. Section 1199, and an order was entered directing the transcript to be amended so as to show:

" '. . . that the Court directed the verdict to be recorded after it had been read to the jury; that the Court then spoke to the jury and then directed that they be

discharged; that thereafter the Clerk of the Courts was starting to pay the jurors and thereupon John C. Curran, Esq., one of counsel for the defendants, moved that the jury be polled, and that thereupon the Court refused the motion to poll on the ground that the jury had been dismissed and the motion came too late.'

"The ruling was clearly correct. Upon its discharge, the jury became defunct as a legal body and was therefore without legal power to alter or amend the verdict, whether by motion to poll or otherwise: Com. v. Johnson, 359 Pa. 287, 291-294 [59 A. 2d 128].

"We do not agree with the defendants' argument now made, that 'the premature dismissal of the jury . . . prevented a motion to poll prior to dismissal.' It is the recollection of the trial judge that the verdict of the jury on each of the twelve counts submitted was read to the jury by the clerk, and when the clerk finished reading, nothing was said by any of counsel for the defense nor was there any indication that counsel for defense wished to say anything. Since no motion to poll was made at that time, the trial judge directed the verdict to be recorded; thanked the jury for their services; and discharged them. The motion to poll was not made until the clerk was in the midst of paying the jurors after their discharge and after their separation. It is the recollection of the trial judge that at least ten minutes had then elapsed since the verdict had been directed to be recorded. The defendants had ample opportunity to make a timely motion but they failed to avail themselves of that opportunity before the jury was discharged."

Counsel for defendants testified at the hearing to correct the record that there were no intervals of sufficient duration within which to make the motion from the time the jury entered the jury box to give their

verdict until the time they were discharged and paid. But they do not in any material respect contradict the corrected record or the recollection of the trial judge. The trial judge recalled that after the clerk finished reading the verdict to the jury nothing was said by counsel for defendants, and that there was no indication that they wished to say anything. On this point one of defense counsel testified: "*Almost* immediately after Mr. Zweibel [the clerk] finished speaking, the Court began addressing the jury, and he thanked the jury for their services in this case, . . ." [Italics supplied.] It was then that defense counsel could have indicated their desire to make a motion. It is significant that the testimony of each of defense counsel at the hearing to correct the record shows that the first move they made to obtain the court's attention or to request the poll was after the trial judge had dismissed the jury. We think defense counsel were required to give some indication to the court prior to the discharge of the jury that they desired to be heard. We recognize that it may not have been proper for them to interrupt the trial judge while he was speaking to the jury, but they could have indicated that they wanted his attention after the clerk had concluded. We do not minimize the importance of having the jury polled, but we find no events so continuous as to preclude an opportunity for defense counsel to attract the attention of the trial judge for the presentation of a motion. As the record and the recollection of the trial judge now indicate, the disposition of the matter appears to have been correct.

Defendants' third contention is that the trial judge erred in several respects concerning defendants' requests for clarification of the charge to the jury. It is argued that he did not adequately explain the stand-

ard of negligence required for a conviction under the statute. The points for charge submitted by defense counsel on this subject were affirmed by the trial judge and read to the jury.[5] After the trial judge read the submitted points to the jury counsel requested orally that the judge charge further on the standard of "criminal negligence." The trial judge properly refused to do so, as the points submitted by defendants and read to the jury more than adequately met the prescribed standard. The Law does not use the term "criminal negligence"; it merely provides a penalty for persons found "negligently guilty" of violating its provisions. But the degree of negligence required does not approach that of criminal negligence, that is, a reckless or culpable negligent act. See *Com. v. Aurick*, 342 Pa. 282, 289, 19 A. 2d 920; *Com. v. Stosny*, 152 Pa. Superior Ct. 236, 241, 31 A. 2d 582. Other matters involving instructions and the refusal of a request for amplification relate to charges upon which verdicts of not guilty were returned. If the refusal of any further ex-

[5] The trial judge affirmed and read the following points to the jury:

"2. In order to convict these defendants, you must find that they were guilty of negligent violations of the provisions of the mining code. And in this connection mere negligence is not sufficient. In order to convict either of these defendants, you must be satisfied beyond a reasonable doubt that they were guilty of that degree of neglect which can be characterized as criminal. . . .

"7. The showing of a mere violation of the provisions of the mining law is not sufficient; the violation must be shown to be negligent. The law does not impute negligence to a violation which is not committed deliberately or ignorantly. The law does not impute negligence to an honest error of judgment. . . .

"8. If you find that any of the violations were the result of honest errors of judgment, and were not the result of negligence, then you must find the defendants not guilty of such violations which amounted to honest errors of judgment."

planation to the jury could be considered error, it was harmless and requires no review at this time. *Com. v. Haun*, 27 Pa. Superior Ct. 33, 38.

Defendants' fourth question in the statement of questions involved relates to the sufficiency of the evidence to support convictions on the second and tenth counts. The second count pertains to the establishment of stopping distances and the starting of test holes when approaching inaccessible workings which are likely to contain water or gas. Rule 15, Article XII of the Law, as amended, 52 PS §286, upon which the charge was based, provides in part: "Whenever a place is approaching inaccessible workings, which are likely to contain a dangerous accumulation of water or gas, the operator shall establish and clearly show on the map furnished the mine foreman a stopping distance not less than one hundred (100) feet from the said inaccessible workings and such stopping point shall not be passed until after the coal company officials, the mining engineer and the mine inspector have agreed on the width of any such approaching place or places and the point or distance at which test holes shall be started. The said test holes shall not be less than twenty (20) feet in advance of the working face." It is argued that there is no evidence to establish that defendants had knowledge of any inaccessible workings which they might be approaching except two—one 1,625 feet west of the face of the mine, and the other encountered near the slope of their mine which they had passed. We think the evidence substantiates the charge in the second count of the information. Defendants began their operation several months prior to the accident on March 27, 1952. Their mine is located in the Holmes vein which runs east and west near what is known as the York Tunnel. There are certain

abandoned workings located in the Holmes vein between defendants' mine and the York Tunnel. They were indicated as follows: The Oakill Mine approximately 2,000 feet to the west; the Kramer Mine 1,500 feet west; the Herman Mine 900 feet west; and two slopes of the New Minersville or Horzusky Mine, one approximately 800 feet west, and the other approximately 600 feet west of defendants' mine. Defendants were working westwardly toward the York Tunnel. Mr. Oakill, who had worked the Oakill Mine in the 1930's, had a conversation with the defendant Cano when defendants were beginning their operation and informed him of his own workings 2,000 feet away, warning him that defendants' mine was heading into water and that they would "hole into" Oakill's abandoned workings. Approximately 150 feet west of their slope defendants encountered an abandoned bootleg working. One of the employes discussed this working and its water hazard with defendant Cano, and some precautions were taken to control the water coming therefrom by means of a dam and pump. Stopping distances were set by defendants with respect to this old working in breasts Nos. 1 and 2 but not for the other breasts. Breast No. 6, for which no stopping distance was set, is the one in which the water broke through and in which the miners were drowned. Defendant Cano testified that no stopping distances were set for breasts Nos. 6 and 7 because he knew of no old workings which those breasts were approaching, and that no instructions were given for drilling ahead for old workings with respect to these breasts.

If an operator has specific knowledge of an old working which he is approaching, the rule requires the notation thereof on a map, the establishment of stopping distances, and a conference with the mine engi-

neer and mine inspector before proceeding. It also requires the carrying of test holes in making the approach. If a specific old working is known, the failure to comply is a violation. It is true that defendants took certain precautions to control the known quantity of water when they encountered the old working 150 feet west of their slope. They did not, however, fully comply with rule 15. They set stopping distances for only two of the breasts, and they did not call in the mine engineer or the mine inspector before continuing westward; they merely assumed that they had passed the old working in their other breasts. The evidence indicates that the full extent of the old bootleg working was not apparent, and that defendants did not fully investigate it. Defendant Cano testified that he climbed out breast No. 3 into the old mine for approximately 60 or 70 feet and found no water; and he apparently assumed that the rest of the working was dry. No further investigation of this old working appears to have been made. The Deputy Secretary of Mines, who investigated after the accident, testified that Cano admitted knowing of the old mine, and that the investigation indicated that breast No. 6 might have been approaching workings which stemmed from this bootleg slope. Since defendants knew of this bootleg mine and had taken some steps to control the water therefrom without fully complying with the provisions of rule 15, they cannot now say that they were not negligent because they had no knowledge of specific old workings which breast No. 6 was approaching. Moreover, one of defendants' employes, who was working in breast No. 6, testified that the fact that they were approaching old workings was called to the attention of defendants two weeks prior to the accident. In response to a question whether he discussed drilling

ahead with the employe in charge of his shift, the witness answered without objection: "I did; being as the men that were working there had a conversation on old workings and bootleg holes ahead of us there, why, and the coal being so wet in the face all the time, I sort of thought it would be a good thing to ask about a drill to drill ahead, which I did, and the answer he gave me, he said he did ask [defendants] about it, but he was told we were lucky to have a drill to cut a drill of coal." Defendants did not object to this testimony or make any denial of the incident. Cano in fact testified that in another part of the Holmes vein they had a man drilling ahead for old workings, but that he did not drill ahead in this part of the mine. In view of the fact that this was not a virgin vein of coal, that defendants knew of some old workings, that they were told of water ahead, that they were looking for old workings in other parts of the same vein, and that they were requested by a miner in breast No. 6 to provide a drill because of bootleg holes ahead, it cannot be contended seriously that they were unaware of the danger they were approaching. The inference clearly arises that they knew or should have known of the bootleg workings, and that they were negligent in failing to take the required precautions to prevent such an accident as occurred. They cannot now plead their purported ignorance of conditions, and say that they knew of no specific old working ahead. Their negligence is what Article XVII, §1 of the Law, 52 PS §511, was designed to cover. There can be no doubt that the Legislature did not intend that stopping distances and test holes be required only if there is actual knowledge of a specific old working, or that operators such as defendants who have knowledge of portions of old workings without knowing the nature and specific location

thereof be excused. Accidents sought to be avoided by rule 15, 52 PS §286, are more likely when the full extent of the danger is not ascertained. We think the rule was applicable and properly applied to defendants.

In connection with this violation it is also contended that the trial judge improperly charged the jury with respect to the duty imposed by rule 15, 52 PS §286. The trial judge originally made an erroneous statement of the Law, but at the request of counsel it was corrected and the entire provision read to the jury. Defendants accepted this correction, and they made no further request for amplification or clarification. Under the circumstances, the contention is not well taken.[6]

Defendants also complain of the refusal of their motion for directed verdict on the tenth count, which charged them with being negligently guilty of violating Article X, §16 of the Law, 52 PS §564. This section requires that reports of air measurements be sent to the mine inspector. Defendants admit that they sent no air reports to any mine inspector, and that they therefore technically violated this section of the Law. But they argue that the failure to send in the reports is not a violation of a provision of the Law whereby a dangerous accident resulted or might have resulted to persons employed in the mine within the meaning of Article XVII, §1, 52 PS §511. In a sense the failure to send in reports may not be likely to cause an accident, but the purpose of the reports is to apprise

---

[6] Defendants also contend that there is no evidence in the record that defendant Martin had knowledge of any old workings. Martin testified that he had no knowledge of old workings or water anywhere. The other testimony indicated, however, that both he and Cano were in charge of the mine and that at the time of the accident Martin was in charge.

the mine inspector of the air measurements so that an accident can be prevented if the proper proportion of air is not maintained. Article X, §16, 52 PS §564, must be read in conjunction with section 4 of the same Article, 52 PS §553, which states that "The ventilating currents shall be conducted and circulated to and along the face of each and every working place throughout the entire mine, in sufficient quantities to dilute, render harmless and sweep away smoke and noxious or dangerous gases, to such an extent that all working places and traveling roads shall be in a safe and fit state to work and travel therein." The requirement of air reports would seem to be of the utmost importance in assuring that the mine is a safe place to work with sufficient air and the absence of accumulations of dangerous gases which might cause an explosion. The Legislature has with clarity indicated and set the standard of this safety measure, the violation of which is likely to result in a dangerous accident.

Finally, defendants complain of a number of rulings by the trial judge on evidence. It is argued that the trial judge allowed a witness to convey a false impression as to the proximity of certain old workings to the defendants' mine upon a blackboard used at the trial. For the benefit of court and jury, the Commonwealth had the mine inspector portray the workings of defendants' mine upon a blackboard. In a later portion of the Commonwealth's case another witness drew in the location of the old Oakill workings but on a different scale because of a lack of space on the blackboard. Defendants contend this gave the erroneous impression that the old workings were closer to defendants' mine than they really were. When the objection was made, the trial judge directed that the proper distance be shown by an arrow. We cannot see how there

was any prejudice as a result. The distance was shown on the drawing and the difference in scale noted. The distance was actually the only relevant matter.

The Commonwealth called as one of its witnesses George Horzusky who had operated previously one of the old workings near the place where defendants' mine was located. At the time Horzusky mined his slopes, defendants' mine was not in existence. The purpose for which this testimony was offered was to establish the existence of the old working. The Commonwealth proposed that other evidence then would show that defendants knew of its existence. This witness, however, was not offered to prove knowledge on the part of defendants. No questions relating to knowledge were asked of this witness by the Commonwealth. On cross-examination, however, defendants attempted to elicit from the witness whether he had told defendants of the existence of his working. The Commonwealth objected to the questions as being beyond the scope of direct examination, and the objections were therefore properly sustained. Moreover, it was not error to refuse to allow cross-examination on the distance from defendants' mine to Horzusky's mine as the witness testified that defendants' mine was not in existence at the time of his operation, that he had no knowledge of the distance, and that he did not know where defendants' mine was located.

The trial judge also sustained the Commonwealth's objection to cross-examination of the witness Michael Sukeena relative to drilling ahead in another portion of the mine. The witness stated on direct examination that he worked only on the east side of the mine, that he never received instructions to drill ahead, and that he did not drill ahead looking for old workings. On cross-examination defense counsel asked him again

whether he had ever done any drilling ahead for the purpose of locating old workings, and the witness answered "No"; no objection was made by the Commonwealth to the question or answer. Defense counsel then asked the witness whether he had done any drilling in the east side of the mine, the only side in which the witness worked, and an objection was made and sustained. As we view it, the question was cumulative although worded differently from the previous question. We find no prejudice under the circumstances. The scope of cross-examination is largely within the sound discretion of the trial judge, and even if a ruling is erroneous the error is not ground for reversal unless it results in an apparent injury. *Com. v. Fine,* 166 Pa. Superior Ct. 109, 115, 116, 70 A. 2d 677. Defendants' contention that the refusal to allow the cross-examination gave the erroneous impression that defendants had never done any drilling ahead is not persuasive in view of the fact that other testimony was permitted which showed that they had done some drilling ahead on occasion.

The other rulings of the trial judge on matters of cross-examination are not properly before us. Defendants complain of the refusal to allow certain questions asked of the witness Harvey Hilbert on two occasions, the witness Edward Mullock, and the witness George Oakill. Defendants, however, did not take exceptions to the rulings on these matters. This case was tried prior to the Act of July 20, 1953, P. L. 552, 12 PS §1196. *Com. v. Guida,* 298 Pa. 370, 376, 148 A. 501. We have examined the record and find the complaints relate to matters of insufficient consequence to prejudice defendants or affect the fairness of the trial.

In the course of the direct testimony of the defendant Martin, he was asked whether he had knowledge

of any lease between the owner of the land and the corporate defendant. The question asked was: "Is there, Mr. Martin, if you know, any arrangement between Indianhead Coal Company and Cano and Martin, Incorporated concerning the development of this property?" The purpose was in furtherance of the defense that the corporation, not the individuals, was the operator and hence the technical violator of the Law. This question and the subsequent questions were improper as they were phrased in the present tense and were not designed to elicit whether there had been any such lease at the time of the alleged violations. In answer to the question the witness might say that there is such an arrangement, referring to the time of trial, and give the impression that there was such an arrangement at the time of the violations. Such defense was adequately presented by other testimony. Defendant Cano was permitted to testify concerning the oral lease arrangements at the time of the violations, and the trial judge in his charge instructed the jury that this was one of the defenses raised.

The last complaint of defendants is that the trial judge erred in refusing to allow defendants to testify as to their plans to close certain cross-cuts permanently, and as to whether or not telephones were at the mine for installation. There is no merit to this argument as the fifth and sixth counts, to which defendants' argument is directed, contain charges upon which defendants were acquitted. See *Com. v. Haun,* supra, 27 Pa. Superior Ct. 33, 38.

We have thoroughly reviewed the record, and we have given detailed consideration to all the issues raised by defendants on these appeals. We conclude that there is no error which would warrant further delay or a reversal of the convictions and sentences im-

posed on defendants. Defendants received a lengthy and fair trial on the charges which were made on August 1, 1952.

Judgments of sentence are affirmed, and the record is remitted to the court below, and it is ordered that defendants appear in the court below at such time as they may there be called, and that they be by that court committed until they have complied with the sentences, or any parts thereof which have not been performed at the time each appeal was made a supersedeas.