491 A.2d 1358

**COMMONWEALTH of Pennsylvania**

v.

**Roland CHECCA, Appellant.**

Superior Court of Pennsylvania.

Argued Nov. 20, 1984.

Filed April 12, 1985.

Petition for Allowance of Appeal Denied Oct. 7, 1985.

484

486

Robert C. Brady, Washington, for appellant.

Lawrence N. Claus, Pittsburgh, for Commonwealth, appellee.

Before BROSKY, ROWLEY and JOHNSON, JJ.

## OPINION OF THE COURT

ROWLEY, Judge:

This is a direct appeal from a Judgment of Sentence imposing a term of 11 and ½ to 24 months imprisonment and payment of the costs of prosecution, following appellant's conviction by a jury of Official Oppression. Upon a careful review of the record and consideration of the numerous issues raised by appellant, we affirm.

The record herein reveals the following facts. On August 26, 1981, John Zimmerman and Patty Teyssier were involved in an altercation in McDonald Borough that resulted in the arrest of Zimmerman. In the presence of Cecil Township Police officers, Ms. Teyssier was ordered to get into her car and drive home. On her way home, she was arrested for Driving Under the Influence (D.W.I.) by the same officers from Cecil Township. Administration of a breathalyzer test revealed a blood alcohol content of .09. An affidavit of probable cause for Ms. Teyssier's arrest was issued by appellant, Roland Checca, a District Justice in Washington County, on the same day.

On September 2, 1981, Ms. Teyssier attended a hearing before Mr. Checca regarding the charges filed against Zimmerman. Following the hearing, Ms. Teyssier asked Mr. Checca about the consequences of her arrest for driving under the influence on August 26, 1981. Ms. Teyssier expressed her concern about facing charges for D.W.I. because she only had a few days left on probation concerning an unrelated offense. Mr. Checca testified at trial in this matter that he told Ms. Teyssier that he already knew about the circumstances of the incident and that he thought the charges would probably be dismissed. Mr. Checca further stated that Ms. Teyssier told him at that time that she would give him anything he wanted. (N.T. October 26—November 2, 1982 at 450).

Mr. Checca admitted that he called the Teyssier residence on September 4, 1981 and that he was told that Ms. Teyssier was at work. He then called Ms. Teyssier at work and

discussed her case with her. He further admitted that she agreed to come to his office at her convenience and that he probably had invited her to do so. On September 14, 1981, Ms. Teyssier called Mr. Checca's office and he told her to come down between 12:00 and 1:00 p.m. Mr. Checca testified that he had called Ms. Teyssier because he wanted to see her and to be alone with her. He admitted that he was interested and excited by her because she was young and he had never had a young girl approach him before. He admitted that he wanted to have a private conversation with her and for that reason he asked her to come to his office on September 14, 1981. When Ms. Teyssier arrived, she met Mr. Checca in the hearing room and they discussed the D.W.I. charges. Mr. Checca then asked her to go into his back office. Ms. Teyssier testified that Mr. Checca hugged and touched her and exposed himself to her. She further stated that he attempted to engage her in further sexual contact which she resisted. Ms. Teyssier testified that Mr. Checca asked her for a sexual favor and that he then asked her about different types of sexual acts. She also testified that Mr. Checca told her that he had done this sort of thing before.

Mr. Checca testified that the incident occurred a little differently. He stated that he asked Ms. Teyssier if the remark "anything he wanted" included sex and she replied affirmatively. He recounted that they then discussed sexual preferences and that she initiated the sexual contact. He insisted that he gave Ms. Teyssier no indication that the sexual encounter had anything to do with the D.W.I. charges and that he was not using those charges as leverage against her.

On September 15, 1981, Ms. Teyssier told Police Chief Schweers of McDonald Borough about the incident in Mr. Checca's office. Thereafter, on September 24, 1981, Ms. Teyssier met with Elaine Surma, an agent from the Pennsylvania Attorney General's office. Ms. Teyssier told Agent Surma what had occurred and as a result of her statement an investigation ensued. Ms. Teyssier consented

to electronic interception of her future conversations with Mr. Checca and electronic surveillance was authorized by Deputy Attorney General James West and Deputy Attorney General Henry Barr.

On September 24, 1981, Ms. Teyssier placed a call to Mr. Checca from Chief Schweers' office which was electronically recorded by Agent Surma. A convenient time for a meeting could not be established on that day.

On September 28, 1981, the day set for Ms. Teyssier's hearing before Mr. Checca on the D.W.I. charges, she placed a second call to Mr. Checca which was again recorded. Mr. Checca requested that she come to his office at noon to discuss the hearing which was to begin at 3:00 p.m. Ms. Teyssier arrived at Mr. Checca's office at approximately 12:30 p.m. She was wearing a body transmitter that enabled Agent Surma to monitor and record the conversation. Ms. Teyssier first encountered Mr. Checca in the hearing room and they then proceeded to his back office. Mr. Checca showed Ms. Teyssier boxes containing pornographic films that he had in a drawer in his office. Ms. Teyssier and Mr. Checca then discussed the sexual acts depicted on the boxcovers. Ms. Teyssier testified that Mr. Checca told her that he would not force her into anything. When he tried to touch her, Ms. Teyssier asked him to stop and told him that she would engage in sexual activity if he would dismiss the charges against her. At the hearing held later on the same day, the charges against Ms. Teyssier were dismissed.

Based on the tapes and the previous incidents described by Ms. Teyssier, a criminal complaint was filed on October 15, 1981. Mr. Checca was charged with Indecent Exposure, Indecent Assault, Solicitation to Commit Deviate Sexual Intercourse, Official Oppression and Bribery.[1] A search warrant for the office of Mr. Checca was also executed on October 15, 1981. Mr. Checca was arrested on October 15, 1981 at his office and advised of his Miranda Rights. He

1. The charge of Solicitation to Commit Deviate Sexual Intercourse was subsequently nol prossed.

consented to the search of his office which revealed the pornographic films described by Ms. Teyssier as well as the record of the dismissal of the D.W.I. complaint filed against Ms. Teyssier. At the time of his arrest, Mr. Checca made a written statement which he signed wherein he stated that he agreed to accept a sexual favor from Patty Teyssier in exchange for dismissing a traffic violation. In his statement, Mr. Checca further admitted that he had attempted to make Ms. Teyssier more comfortable by telling her that he had done this sort of thing before.

On December 22, 1981, Mr. Checca filed a request for Pre-trial Discovery and Inspection and a request for a Bill of Particulars wherein he demanded detailed information pertaining to Ms. Teyssier's prior status as a government informant. Specifically, Mr. Checca requested, *inter alia*, names and numbers of cases wherein Patty Teyssier was utilized as an informant, names of cases wherein information obtained by her was reliable or unreliable, and copies of search warrants containing information received by Ms. Teyssier. These specific requests for discovery were objected to by the Commonwealth and ultimately denied by the trial court on February 11, 1982 by Memorandum and Order. The trial judge noted that Ms. Teyssier's reliability as an informant in other cases was irrelevant as to the probable cause issue and that, insofar as the requested information was relevant to the entrapment defense in this case, it could be developed on cross-examination.

On February 2, 1981, Mr. Checca filed omnibus pre-trial motions including a motion to suppress the recorded tapes, the evidence seized incident to the alleged unlawful search of his office, and the signed statement he gave at the time of his arrest. Following an extensive Suppression Hearing which commenced on June 30, 1982, the suppression court denied Mr. Checca's motion to suppress the above-mentioned evidence. (Suppression Transcript, June 30—July 2, 1982 at 559–564). ·

On July 7, 1982, appellant's trial commenced before a jury from Erie, Pennsylvania, which had been transported to

Washington County. A mistrial was declared at the close of the opening statement of the Assistant District Attorney. The mistrial was granted because of the following statement by the prosecutor: "we have brought these criminal charges based upon evidence that we believe that he is guilty of the charges that have been brought." Appellant's motion to dismiss the charges against him on double jeopardy grounds was dismissed by the trial court on August 6, 1982.

Appellant's trial commenced before a second jury from Erie County on October 26, 1982. At the close of the trial, the jury acquitted appellant of Bribery, Indecent Exposure and Indecent Assault, but convicted him on the charge of Official Oppression. Appellant was subsequently sentenced to undergo imprisonment for a period of eleven and one-half months to twenty four months and to pay the costs of prosecution. This timely appeal followed.

■ Appellant raises numerous issues on appeal. His initial contention is that the Double Jeopardy Clause of the Fifth Amendment barred a second trial regarding these charges because the prosecutor's misconduct at his first trial was intended to provoke the defense into moving for a mistrial. The trial judge found that the prosecutor's remarks were unintentional and inadvertent and that they were not intended to abort the trial. He therefore refused to dismiss the charges against appellant on double jeopardy grounds. (Opinion of Kiester, J., August 5, 1982). We find that the trial judge's decision was supported by evidence of record and we need add nothing further to his resolution of this issue.

Appellant next contends that electronic surveillance of his conversations with Ms. Teyssier was made without proper authorization and that the search warrant executed on the basis of information obtained through electronic interception was invalid. Accordingly, appellant contends that the trial court erred in denying his motion to suppress the recorded tapes, the evidence obtained during the search and

appellant's signed statement given at the time of his arrest. Appellant's contentions are without merit.

Appellant argues that a memorandum of consent issued by Deputy Attorney General James West containing the phrase "between September 24, 1981 and September 28, 1981" did not give proper authorization for consensual interceptions conducted on September 28, 1981 since "between" should be interpreted as excluding the first and last days from the authorization. Appellant urges that the language "occurring on September 24, 1981 through and including September 28, 1981" was required in order to properly authorize the interception on September 28, 1981. Although the Pennsylvania Wiretapping and Electronic Surveillance Act (Wiretap Act) requires that approval must be obtained from the District Attorney or Attorney General or a designee thereof prior to commencement of a consensual interception, 18 Pa.Cons.Stat. § 5704(2)(ii), neither the Wiretap Act or relevant case law requires that a "Memorandum of Consent" be executed by the proper authority. Surveillance conducted with the consent of a party to the conversation is not subject to the exacting standards of authorization required for non-consensual surveillance under the Wiretap Act.

The "Memorandum of Consent" in this case was prepared by Deputy Attorney General West so that he would have something available to refresh his recollection regarding the interceptions. (Suppression Transcript, June 30—July 2, 1982 at 210). Deputy Attorney General West testified that the interceptions in this case were further approved "for through and including September 24th through September 28th, 1981." (Suppression Transcript, June 30—July 2, 1982, at 210). Because of the informal nature of the memorandum, and the fact that such documentation in cases where one party consents to interception is not specifically required by the Wiretap Act, we find that the suppression judge properly looked beyond the scope of the written document to determine the scope of the authorization.

 Appellant also argues that the information in the affidavit of probable cause executed in support of the search warrant was stale because the facts alleged in the affidavit occurred on or before September 28, 1981 and the warrant was not obtained until October 15, 1981. This contention has been waived since it was not specifically raised in appellant's pre-trial motion to suppress. We nevertheless find this contention to be without merit because the activities involved herein were of a continuous nature and they were the subject of an ongoing criminal investigation. *See e.g., Commonwealth v. O'Bryant,* 320 Pa.Super. 231, 467 A.2d 14 (1983); *Commonwealth v. Marzel,* 291 Pa.Super. 553, 436 A.2d 639 (1981).[2] Because we find that the electronic interceptions were properly authorized and the search warrant based thereon was properly made out, we conclude that the suppression judge did not err in refusing to suppress the tapes and the evidence obtained during the search, including appellant's written statement.

Appellant next contends that the trial court erred in refusing to grant his request for discovery, and refusing to allow cross-examination of Ms. Teyssier, regarding her prior status as a police informant. Appellant further argues that the trial court erred in refusing to instruct the jury on the entrapment defense. We find these claims to be equally without merit.

 Pre-trial disclosure of all exculpatory evidence held by the Commonwealth is required. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). However, the defendant's right to disclosure is not unlimited. Where the Commonwealth represents to the court that the requested materials do not contain exculpatory informa-

---

2. Appellant also contends that the search was illegal because the search occurred at night whereas the warrant authorized a daytime search. This contention is entirely without merit. The search began at approximately 8:00 p.m. and it was completed before 10:00 p.m. Pa.R.Crim.P. 2005 governing requirements for issuance of warrants states that the term "daytime" means between the hours of 6:00 a.m. and 10:00 p.m.

tion the question is whether or not the court properly accepted the Commonwealth's representations without personally inspecting the documents. *Commonwealth v. Watson,* 276 Pa.Super. 606, 419 A.2d 623 (1980).

■■■ In *Commonwealth v. Gartner,* 475 Pa. 512, 381 A.2d 114 (1977), our Supreme Court stated:

A defendant is entitled to a court inspection of the Commonwealth's investigatory files only when there exists at least some reason to believe the inspection would lead to the discovery of evidence helpful to the defense. *See Commonwealth v. Royster,* 472 Pa. 581, 372 A.2d 1194 (1977) (plurality opinion). Here, appellants made no showing that the court's inspection would reveal evidence helpful to the defense. The court's denial of appellants' request was proper. *See United States v. Agurs,* 427 U.S. 97, 106, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976).

*Id.,* 475 Pa. at 525, 381 A.2d at 120. In the instant case, appellant claims that the trial court's denial of discovery of Commonwealth files regarding Ms. Teyssier's prior status as an informant deprived him of the opportunity to raise the entrapment defense. Nonetheless, appellant offered no valid reason for the court to question the Commonwealth's representation that the materials requested did not contain exculpatory information. The trial court thus found that there was no evidence to support a finding that the victim was acting as an agent of law enforcement officials in this case and he therefore refused discovery of the requested materials. We find no error in that determination.

■■■■ These same principles support the trial court's refusal to allow cross-examination of the victim regarding her prior status as a government informant. Appellant offered no evidence to support his theory that the victim acted as an agent of law enforcement authorities during initial encounters with appellant. Moreover, the victim's prior status as an informant was irrelevant as to the issue of her credibility with respect to this case. A witness' credibility cannot be attacked on the basis of prior conduct which is unrelated to the issues at the present trial. *See*

*Commonwealth v. Bighum,* 452 Pa. 554, 307 A.2d 255 (1973); *Commonwealth v. Cragle,* 281 Pa.Super. 434, 422 A.2d 547 (1980). Appellant had ample opportunity during cross-examination to ask Ms. Teyssier whether she was working for, or hoping to derive benefit from, law enforcement authorities with respect to the instant case. Under these circumstances, we find no abuse of discretion in the trial court's refusal to allow cross-examination into the victim's status as an informant in other unrelated cases.

Regarding entrapment, no evidence was offered to show that the initial contacts between Mr. Checca and Ms. Teyssier were instigated or encouraged by, or on behalf of, law enforcement officials. Mr. Checca admitted that he initiated the discussions regarding sexual favors. (N.T. October 26—November 2, 1982 at pp. 454–455). The burden of proof is on the person prosecuted for an offense to prove, by a preponderance of the evidence, that his conduct occurred in response to an entrapment. 18 Pa.Cons.Stat. § 313(b). Appellant offered no evidence whatsoever to show that his conduct was so induced. Accordingly, appellant's requested instruction on the entrapment defense was properly denied by the trial judge. *Compare Commonwealth v. McGuire,* 339 Pa.Super. 320, 488 A.2d 1144 (1985).

Appellant's next contention is that the trial court erred in charging the jury that consent is not a defense to the charge of official oppression. Our research has revealed no case in Pennsylvania wherein this issue has been addressed. Nonetheless, our analysis of the consent statute and the statutory definition of the crime of official oppression convinces us that the trial judge properly instructed the jury not to consider consent of the victim as a defense to official oppression in this case.

Official oppression is defined as follows:

A person acting or purporting to act in an official capacity or taking advantage of such actual or purported capacity commits a misdemeanor of the second degree if, knowing that his conduct is illegal, he:

(1) subjects another to arrest, detention, search, seizure, mistreatment, dispossession, assessment, lien or other infringement of personal or property rights; or

(2) denies or impedes another in the exercise or enjoyment of any right, privilege, power or immunity.

18 Pa.Cons.Stat. § 5301. This section is modeled after § 243.1 of the Model Penal Code. *See* Historical Note to 18 Pa.Cons.Stat. § 5301. The statute was broadly drafted to include all opportunities for oppressive use of official power. Thus, the section applies to improper denial of aid, privilege or protection to which a person is entitled by law, as well as aggressive action against the individual. *Model Penal Code, Tentative Draft No. 9,* 214 (1959).

18 Pa.Cons.Stat. § 311 regarding consent as a defense to criminal offenses provides, in pertinent part:

(a) *General rule.*—The consent of the victim to conduct charged to constitute an offense or to the result thereof is a defense if such consent negatives an element of the offense or precludes the infliction of the harm or evil sought to be prevented by the law defining the offense.

\* \* \* \* \* \*

(c) *Ineffective consent.*—Unless otherwise provided by this title or by the law defining the offense, assent does not constitute consent if:

\* \* \* \* \* \*

(3) it is given by a person whose improvident consent is sought to be prevented by the law defining the offense; or

(4) it is induced by force, duress or deception of a kind sought to be prevented by the law defining the offense.

 The evil sought to be prevented by the law against official oppression is the unlawful abuse of the power of public officials. Mr. Checca's action in using his position as a district justice to receive sexual favors from a woman whose case was pending before him was an illegal use of his office proscribed by the law against official

oppression. That Ms. Teyssier may have solicited him at the outset does not change our analysis since the facts support a conclusion that Mr. Checca agreed with her proposal. Moreover, the record reveals that it was appellant who suggested a sexual encounter between himself and Ms. Teyssier. The consensual nature of Ms. Teyssier's conduct did not negative the harm sought to be prevented by the law against official oppression, especially since her consent may have been motivated by her concern that the D.W.I. charges would provide a basis for revocation of her probation. Mr. Checca's action in using his official position as a vehicle to take advantage of a defendant whose case was pending before him was conduct meant to be covered by the official oppression statute whether or not Ms. Teyssier consented. We find that under circumstances where a public official, under color of his office, solicits or accepts a sexual favor in the course of discharging a duty of his office, the assent of the victim is not a defense to a charge of official oppression. *See e.g., Commonwealth v. Froelich,* 458 Pa. 104, 326 A.2d 364 (1974).

Appellant urges that because consent is a defense to indecent exposure and indecent assault, it is also a defense to official oppression. This contention is without merit. The elements of the offense of official oppression are different than the elements of either of these offenses. The harm sought to be prevented by the laws against indecent assault and indecent exposure is non-consensual contact; such unlawful conduct does not affect the administration of public office unless an abuse of official authority is also involved. Such behavior may constitute official oppression only if that behavior involves the added element of a public official's use of his status to wrong another. Moreover, behavior that does not constitute indecent exposure or assault—because of the victim's consent or otherwise—may constitute official oppression.

We are likewise unpersuaded by appellant's argument that his acquittal on charges of bribery was inconsistent with his conviction for official oppression. The official

oppression statute was broadly drafted to reach numerous situations wherein an official engages in wrongdoing while acting in his official capacity. The offense overlaps offenses such as bribery and indecent assault, but it also reaches abuses of official authority that are not covered by these other statutes. *See Model Penal Code, Tentative Draft No. 9,* 216 (1959). Thus, evidence that appellant accepted a sexual favor, but did not do so *in consideration* for dismissing D.W.I. charges against Ms. Teyssier, may have precluded a conviction for bribery, if such evidence was believed by the jury. However, such evidence wouldn't necessarily negate an element of the crime of official oppression since that crime requires proof only that appellant acted in his official capacity and, knowing his conduct to be illegal, subjected another to a "mistreatment."

▆▆ Appellant also argues that the term "mistreatment" in the official oppression statute is unconstitutionally vague as applied to the particular facts of this case. Appellant contends that a common understanding of the term mistreatment does not encompass an action which is consented to by the victim. Examining the challenged statute in the light of the conduct with which appellant was charged, we find that appellant should reasonably have understood that his actions were proscribed by the statutory prohibition against "mistreatment". Appellant's treatment of Ms. Teyssier was no less of an abuse of his office because she may have consented in order to insure dismissal of the charges against her. *See Commonwealth v. Manlin,* 270 Pa.Super. 290, 411 A.2d 532 (1979).

▆▆ Appellant's final contention is that the trial court abused its discretion in sentencing appellant to 11 and ½ months to 24 months imprisonment at the State Correctional Institute at Greensburg following his conviction of official oppression. In determining the proper sentence, the trial court must consider the character of the defendant and the particular circumstances of the offense in light of legislative guidelines for sentencing. The court must impose a sentence that is the minimum sentence that is consistent with the protection of the public, the gravity of

the offense, and the rehabilitative needs of the defendant. *Commonwealth v. Golden*, 309 Pa.Super. 286, 289, 455 A.2d 162, 163 (1983). Official oppression is a Misdemeanor of the Second Degree and the penalty provided is a maximum term of imprisonment of two years and a maximum fine of $5,000.00. In sentencing appellant, the judge observed that Mr. Checca would probably not commit another crime of this nature and that there was no need for rehabilitation. The trial judge further observed that Mr. Checca presented no danger to the public. However, regarding the gravity of the offense, the judge stated that Mr. Checca had violated not only his oath of office, but had betrayed his family and the community. The judge observed that appellant had employed the authority and power of his office for a dishonest and dishonorable purpose. In imposing sentence, the judge stated that he felt confinement was required because of the nature and circumstances of the crime and because a lesser sentence would depreciate the seriousness of such a crime. We find that the sentencing judge's explanation of his reasons for sentencing reveals that he considered all relevant factors under the Sentencing Code in sentencing appellant. *See* 42 Pa.Cons.Stat. § 9721(b). We find no error which constitutes an abuse of discretion.

Judgment of sentence affirmed.