408 Pa. Superior Ct. 518 (1991)
597 A.2d 152
COMMONWEALTH of Pennsylvania, Appellee,
v.
Joseph F. O'KICKI, Appellant. (Two Cases)
Superior Court of Pennsylvania.
Decided August 20, 1991.
Argued April 23, 1991.
Reargument Denied October 15, 1991.
*523 James B. Yelovich, Somerset, for appellant.
Robert A. Graci, Deputy Atty. Gen., Harrisburg, for Com., appellee.
*524 Before ROWLEY, President Judge, and CAVANAUGH and JOHNSON, JJ.
CAVANAUGH, Judge:
Joseph F. O'Kicki appeals from a judgment of sentence of 2 to 5 years imprisonment and the imposition of fines totalling $57,500.00 as well as an order of restitution. Sentencing followed the denial of post-trial motions after O'Kicki was found guilty by a jury in Cambria County on December 16, 1989 of one count of official oppression, three counts of bribery, and single counts of criminal coercion and demanding property to secure employment. The jury also acquitted appellant of counts of open lewdness, criminal coercion, bribery and criminal attempts to speculate on official information. Twenty-three issues are raised on appeal.[1]
The first three issues relate to alleged errors in the rendition of the jury verdict. After announcement of the verdict by the foreman, counsel for the appellant asked for a jury poll and the clerk, in accordance with the court's direction, proceeded to do so. When juror No. 5 was being polled and after his response to three of the counts the clerk asked the juror if he had them "mixed up". The court then took over the polling of juror No. 5 and asked him as to each count. The juror responded and his response, which was recorded, differed from the announced verdict as to five counts. The clerk proceeded with the polling and after its completion, the jury was dismissed. After the appellant was called forward, appellant's counsel raised the issue that the verdict was not unanimous and asked for a mistrial. The court denied the motion and commented that he had examined the juror himself and found no lack of unanimity.
*525 Appellant raised the jury verdict issue among the post-trial motions which were filed. On December 28, 1989, twelve days after the entry of the verdict, Judge Grifo convened a hearing on his own motion pursuant to Pa. R.Crim.P. 1123. At the hearing the juror in question, James Miller, stated that he agreed with the jury verdict as announced by the chairperson[2] of the jury and that during the polling he had made a mistake explaining that he was "exhausted" at the time. Appellant attacks this procedure and argues that the court impermissibly permitted the juror to impeach his verdict.
It is clear from the record that the court was unaware that the juror had differed from the announced verdict during the jury poll since he stated that he saw no lack of unanimity and dismissed the jury.
The thrust of the Commonwealth's argument is that the verdict was properly recorded as unanimous in accordance with the announced verdict of the chairperson and the unanimous assent of all jurors thereto. Thus, waiver is argued on the ground that no objection to unanimity was made until after all jurors had been polled and the court dismissed the jury. In Commonwealth v. Cano, 182 Pa.Super. 524, 128 A.2d 358 (1956), aff'd., 389 Pa. 639, 133 A.2d 800 (1957) the court opined that objection to the verdict must be made before the jury is dismissed. Nevertheless, we believe the trial court was correct in ordering a hearing on the unanimity issue in order to clear up the questions raised by the juror's answers to the jury poll. Clearly, the juror was not in any way impeaching the verdict, but was simply given an opportunity to explain on the record a discrepancy in the fact that he, together with all the other jurors, assented to the announced verdict, but in his case gave answers which contradicted this assent during the jury poll.
O'Kicki's next contention is that the court erred as a matter of law in refusing to grant his motion for a change *526 of venue or venire. Specifically, appellant complains that the court did not conduct a hearing pursuant to the motion for change of venue or venire as is contemplated by Pa. R.Crim.P. 312. As appellant must concede, change of venue motions are addressed to the sound discretion of the trial court and are reviewable on an abuse of discretion standard. Commonwealth v. Breakiron, 524 Pa. 282, 571 A.2d 1035 (1990). Moreover, in delaying his ruling until after the voir dire, the trial court was acting under established authority. Our supreme court has stated:
The opportunity to observe the demeanor of the prospective juror and the tenor of the juror's answers is indispensable to the judge in determining whether a fair trial can be had in the community. Claims of impartiality by prospective jurors are subject to scrutiny for credibility and reliability as is any testimony and the judgment of the trial court is necessarily accorded great weight. As stated in United States v. Wood:

Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula.

Id. 299 U.S. 123, 145-146, 57 S.Ct. 177, 185, 81 L.Ed. 78, 87 (1936) reaffirmed in Irvin v. Dowd, supra 366 U.S. [717] at 725-726, 81 S.Ct. 1639 at 1644, 6 L.Ed.2d [751] at 757. [(1961)] "After the voir dire a judge can determine which description of the publicity's impact is accurate; before the voir dire a judge could only have guessed." United States v. Haldeman, 559 F.2d 31, 62 n. 37 (D.C.Cir.1976) (en banc), cert. denied, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977).
Commonwealth v. Bachert, 499 Pa. 398, 409-410, 453 A.2d 931, 937 (1982).
See also Commonwealth v. Romeri, 504 Pa. 124, 470 A.2d 498 (1983).
With respect to the underlying merits of the venue motion, we note that "in reviewing a trial court's decision *527 [as to a change of venue] the only legitimate inquiry is whether any juror formed a fixed opinion of [the defendant's] guilt or innocence as a result of pre-trial publicity." Commonwealth v. Casper, 481 Pa. 143, 150-151, 392 A.2d 287, 291 (1978). The court has further observed:
We have, however, recognized that occasions may arise where the pre-trial publicity is so pervasive and inflammatory that a defendant;s normal burden of demonstrating actual juror prejudice is obviated. Pre-trial prejudice is presumed if: (1) the publicity is sensational, inflammatory, and slanted towards conviction rather than factual and objective; (2) the publicity reveals the accused's prior criminal record, if any, or if it refers to confessions, admissions, or reenactments of the crime by the accused; and (3) the publicity is derived from police and prosecuting office reports. Id.

The publicity must be so extensive, sustained and pervasive without sufficient time between publication and trial for the prejudice to dissipate, that the community must be deemed to have been saturated with it. Id.

Commonwealth v. Pursell, 508 Pa. 212, 221, 495 A.2d 183, 187-188 (1985).
With respect to these standards as applied to the publicity in this case, we agree with the comments of the trial court in its opinion:
Moving on now to Paragraph 1 of Defendant's Motion for a New Trial, the Court doesn't think there's any question that the pretrial publicity was pervasive, but it doesn't think one can fairly argue that such publicity was "sensational" or "prejudicial". There may have been one or two stories that were a bit off-color, such as the one in mid-September 1989, pertaining to Defendant's allegedly visiting a house of prostitution, but even there, the story was based on information that was presented by the Attorney General's office as though it were factual. The Court does not recall, nor has it found in voir dire Exhibit 1, any nonfactual, nonreporting type stories  except one benign opinion poll regarding whether or not there should *528 be a continuance  prior to commencement of jury selection, though there were editorials and letters to the editor, as well as quotes from County Commissioner Ron Stephenson (Johnstown Tribune-Democrat, 3/31/89 and 4/1/89) and anonymous lawyers (4/9/89). But these were few and far between and occurred primarily a substantial enough time before jury selection that they would not, and did not, preclude the selection of an openminded, fair jury, and the Court believes that the individual voir dire of potential jurors reflects that.
Lower Court Opinion, June 8, 1990 at ____.
The court then proceeded to analyze an exhaustive number of newspaper articles and demonstrated that they did not subject appellant to pervasive, prejudicial, sensational publicity. The articles, for the most part, merely detailed the history and progress of the pending proceedings and were devoid of commentary on the merits of the case. The trial court's decision is further buttressed by the fact that most of the publicity cited by appellant occurred so far in advance of trial that the harmful effect of any adverse publication was clearly dissipated. Commonwealth v. Breakiron, supra.
The next issue concerns the misjoinder of charges. The obverse argument is made that the court erred in severing the charges as it did, essentially granting the motion to sever insofar as the charges were separated for two trials; one set of charges relating to defendant's "public" acts and the second charges for separate trial relating to "private acts". Again, we are circumscribed in our review of the trial court's decision to a manifest abuse of discretion standard. Commonwealth v. Morris, 493 Pa. 164, 425 A.2d 715 (1981). As stated by the late Chief Justice Eagen, "As a general proposition it is well established that the grant or denial of severance is a matter of discretion with the trial judge whose conclusion will be reversed only for manifest abuse of discretion or prejudice and clear injustice to the defendant." Commonwealth v. Peterson, 453 Pa. 187, 193, 307 A.2d 264, 267 (1973). In *529 Peterson, supra, the court also applied the tripartite test for determining whether the joinder of offenses is productive of impermissible prejudice. Here the alleged offenses were sufficiently discrete so that (1) the defendant would not become embarrassed or confounded in his defense; (2) it is unlikely that the jury would use the evidence of one offense to infer guilt of another offense; and (3) the evidence would not be cumulated to determine guilt. Moreover, the common thread is occupancy of and alleged use of public office by the defendant. See Commonwealth v. Hradesky, 170 Pa.Super. 24, 84 A.2d 393 (1951); Commonwealth v. Bellis, 252 Pa.Super. 15, 380 A.2d 1258 (1977). We see no error or abuse of discretion in the court's order of severance.
The next several issues relate to the qualifications or bias of jurors who served or were not excused for cause. Again, we are met with an issue where, "... the decision whether to disqualify a juror is within the sound discretion of the trial court and will not be reversed in the absence of a palpable abuse of discretion." Commonwealth v. Lewis, 523 Pa. 466, 474, 567 A.2d 1376, 1380 (1989) (citing cases). With respect to five of the prospective jurors, it is argued that the court erred in denial of challenges for cause since they had "indicated" fixed opinions prejudicial to the defendant.
The standard applicable to such challenges has been stated by the supreme court:
The test for determining whether a prospective juror should be disqualified is whether he or she is willing and able to eliminate the influence of any scruples and render a verdict according to the evidence, and this is to be determined on the basis of answers to questions and demeanor, Commonwealth v. Bighum, 452 Pa. 554, 307 A.2d 255 (1973). It must be determined whether any biases or prejudices can be put aside on proper instruction of the court, Commonwealth v. Drew, 500 Pa. 585, 459 A.2d 318 (1983).
*530 Commonwealth v. Colson, 507 Pa. 440, 454, 490 A.2d 811, 818 (1985).
With respect to each of the witnesses wherein the court denied challenges for cause, we allude in each instance to portions of the voir dire which we find supports the court's ruling, despite some admission by the witness in other questions as to possible bias or prejudgment.
1. C. JEANNE HICKS 
BY MR. VON GEIS:
Q. Let me try to ask you the bottom line question. If you were chosen to sit on this jury and you were one of the 12 persons who would decide ultimately whether or not Mr. O'Kicki were guilty or innocent, and if Judge Grifo sitting here instructed you as a juror that you would have to set aside any preconceived beliefs you had, or any opinions or anything you gathered outside of the courtroom, that you would have to listen to the evidence and base your decision as to guilt or innocence strictly on what you heard in that courtroom, without making any assumption of guilt, could you do that?
A. Yes.
Q. You could follow the Judge's instruction?
A. I could follow his instructions, yes.
MR. GALLOWAY: Challenge.
THE COURT: Mrs. Hicks, if the court were to tell you that it's your duty to listen to the testimony, to set aside any bias or fixed opinions that you had, and then base your decision on what you heard in the courtroom, could you set aside your bias and your fixed opinions and decide the innocence or guilt of Judge O'Kicki?
MRS. HICKS: I don't know.
THE COURT: What's your answer?
MRS. HICKS: I said I don't know. I still say I'd have to listen.
THE COURT: All right. Now you're saying you don't know. Could you and would you make a reasonable attempt to do that?

*531 MRS. HICKS: Yes.
.....
THE COURT: Knowing that that was the instruction of the court?
MRS. HICKS: Yes.
.....
2. VICTORIA GETZ 
Q. Now that you have formulated an opinion, which you tell us you can put aside about the Judge's guilt, do you believe it's Judge O'Kicki's responsibility to prove he is innocent?
A. Right. I do.
Q. Now, if Judge Grifo tells you that Judge O'Kicki as the Defendant doesn't have to prove a thing, doesn't have to say anything, doesn't have to prove anything, and it's the job of the Government to prove that he is guilty beyond a reasonable doubt, could you put aside your feeling that Judge O'Kicki has to prove himself innocent, or are you still going to look to Judge O'Kicki for evidence of his innocence?
A. I'd think I'd look toward him for the evidence.
Q. Even if Judge Grifo told you that he didn't have to prove a thing, you would still look to Judge O'Kicki for evidence of his innocence?
A. Well, if I had to go along with it, I'd go along with the Judge.
Q. Which one?
A. Judge Grifo.
Q. If the Judge told you that the burden of proof in this case belonged to the Government and they must prove him guilty, you wouldn't look to Judge O'Kicki for evidence of his innocence?
A. Yes.
MR. VON GEIS: Your Honor, I think she's answered the question.
THE COURT: She's answered it now, yes.
MR. YELOVICH: I'm sorry. What was your answer?

*532 THE COURT: Her answer was yes.
.....
3. HELEN PETROSKY 
Q. All right. Let me ask you 
A. Maybe not on all counts, but on quite a few.
Q. All right. Let me ask you a question, ma'am. Once again, assuming that you were chosen as one of the 12 jurors to sit on this case, if you were told by Judge Grifo, the trial Judge, that as a juror you would have a responsibility and a duty to, first of all, presume Mr. O'Kicki innocent, and secondly, that you could not form any opinion as to guilt or innocence, and if you did hold such an opinion, you would have to put aside, keep an open mind, listen to the evidence and base your decision strictly on what you would hear in Court, could you cast aside your opinion as to his guilt, decide the case only on the evidence in Court?
A. Yes, I would.
THE COURT: Mrs. Petrosky, if I were to ask you  or tell you that questions encompassing legal principles regarding the presumption of innocence and the burden of proof and your understanding thereof are not required, and then if I were to add having a fixed opinion in this case, if I instructed you, could you set that fixed opinion aside and listen to testimony that came before you, and based only on that question  only on that testimony, render a fair and impartial decision? Could you do it?
MRS. PETROSKY: Yes, I could.
THE COURT: Let's put it very basically and very simply. This man, under our Constitution, is presumed to be innocent. Will you accord him that presumption before you decide, after having heard the facts, fairly and impartially that he is otherwise?
MRS. PETROSKY: Yes, I would accord him that presumption.
THE COURT: All right.
.....

*533 4. CRYSTAL RYAN 
Q. All right. In spite of that feeling that you have, that you might expect a little bit more of them, if you were selected as a juror and you were instructed by Judge Grifo that as a juror you could not afford any more weight or any less weight to somebody's testimony based upon their being a public official, could you base your 
A. Sure. If it was explained, I think I could do it.
THE COURT: Mrs. Ryan, if I were to tell you that you were to consider the testimony of all witnesses equally and not give that testimony any special credence because the witness happens to be a police officer, could you set aside your personal bias and accept that?
MRS. RYAN: I think so.
THE COURT: Outside business. If I were to instruct you that in judging the guilt or innocence of Judge O'Kicki you could not use the fact alone  or could not use the fact at all that he may or may not have had outside interests, could you judge him unbiasedly after that instruction?
MRS. RYAN: Well, like I said, it depends on how much time your outside interests would take you away from doing the job that you should be doing.
THE COURT: It would depend on the circumstances?
MRS. RYAN: Right.
.....
5. TED GOLDMAN 
Q. Sir, if you were chosen to sit on this jury and you were instructed by Judge Grifo that whatever personal feelings you have about the office of Judge you would have to set aside and decide this case only on the evidence you heard in Court, could you set aside 
A. Yes, I can do that, sure.
BY MR. VON GEIS:
Q. Mr. Goldman, in spite of your feeling that you've indicated by the sheer number of charges you feel that there must be something to it, as you've said, if you were *534 instructed  if you were chosen to sit on the jury and Judge Grifo instructed you that as a juror you could not infer anything from the number of charges, that you would have to evaluate each charge based upon the evidence supporting it, without any reference to the number, could you follow that instruction?
A. Definitely.
Q. Sir, if you were chosen to sit on this jury and you were told by Judge Grifo, the trial Judge, that as a juror you must presume the Defendant to be innocent and that it's the Government's burden to prove him guilty beyond a reasonable doubt, could you follow that instruction?
A. Yes, sir.
MR. VON GEIS: All right. I have no other questions, Your Honor.
THE COURT: And could you lay aside any locked-in or fixed opinion that you may have obtained because of what you read or heard about the case and decide this case based on the evidence as presented in Court?
MR. GOLDMAN: Most definitely.
In a similar vein it is argued that one of the jurors who actually sat and participated in the verdict failed to disclose on voir dire that his son had appeared before appellant in juvenile proceedings and been adjudicated delinquent. Appellant seeks a new trial on the basis that the juror misrepresented his family's history relative to Judge O'Kicki. Principal reliance for appellant's contention is placed upon Commonwealth v. Rosario, 198 Pa.Super. 177, 182 A.2d 75 (1962) a 4 to 3 decision of the Superior Court where the decision was based on the assumption two jurors had answered in the negative when asked if they were related to any law enforcement officers when, in fact, the jurors were each parents of Pennsylvania State policemen. Contrasted to this situation is the present one wherein the juror, Henry Hudy, in a long series of questions simply answered "No" when asked if any member of his family had appeared before appellant as a party or witness. It is contended by appellant that, in fact, some 17 years previous *535 juror Hudy's son had appeared before O'Kicki in juvenile proceedings. Judge Grifo, noting that in the disposition of that case, the son had received more favorable treatment than his co-defendant, opined that "clearly the juror could have harbored no ill will toward the defendant, and therefore, defendant was not prejudiced by what undoubtedly was just a simple misstatement of something long forgotten." We agree and find no abuse of discretion.
Appellant raises a quartet of prosecutorial misconduct claims, which, it is argued, should, when the "cumulative effect" thereof is considered result in dismissal of the charges.
The first component is the claim that the attorney general engaged in conduct which improperly caused the original assigned judge, the Honorable Melvin G. Levy, to recuse himself. While it is clear that Judge Levy entered an order which, sua sponte, recused himself from further participation in the case, appellant argues that he did so only in response to two motions for recusal filed by the attorney general which had the effect of in some way threatening prosecution under 18 Pa.C.S.A. § 4702 threats and other improper influence in official and political matters.
Under date of July 25, 1989, Judge Levy did enter an order which, citing the pressure of business in his own judicial district, the potential bias resulting from presiding over pretrial proceedings including the preliminary hearing and the likelihood that the present matter would involve two protracted trials, sua sponte recused himself "from further participation in [the O'Kicki case]".
It appears that counsel for both parties were present on July 1, 1989 in the Delaware County chambers of Judge Levy for a scheduled pre-trial conference. At that time, counsel for the prosecution asked for a chambers discussion at which time a motion for recusal was presented to Judge Levy. The motion was not formally filed and, thereafter, "a supplemental motion for recusal" was presented. This was not filed of record either. Judge Levy then adjourned the scheduled pre-trial conference to a later date. We have *536 reviewed the Motion for Recusal and Supplemental Motion for Recusal.[3]
The original motion was grounded on the potential for prejudice by reason of the court's having been exposed to evidence and argument at the preliminary hearing and other pre-trial procedures, as well as the court demands of Judge Levy's home county. The supplemental motion for recusal cited certain reported remarks allegedly made by Judge Levy concerning his aspiration for an expeditious disposition of certain legal proceedings which the Commonwealth felt might signal his predisposition with respect to issues that would be presented to him. The supplemental motion also argued a concern about Judge Levy's objectivity in ruling on certain issues anticipated in the O'Kicki case based upon the fact that Judge Levy had, on several occasions, written to state officials registering displeasure and urging prompt action against a physician against whom a complaint had been lodged with the Bureau of Professional and Occupational Affairs. We need not consider the merits of the Commonwealth's recusal motion since Judge Levy acted on his own in entering the recusal order sua sponte and no longer participated in the case in any way. The suggestion that he did so under a threat of prosecution is wholly without merit. There is not even a remote implication that there was any intent to convey such a threat to the court, or that it was so perceived by the judge at any time. Nor, as suggested by appellant, is there any evidence that Judge Levy was "investigated" by the prosecution. Finally, while we do not approve of presenting unfiled motions to the court, it is clear that all counsel were given copies of the recusal motions when they were offered to the court. We find no support to the claim of prosecutorial misconduct in the circumstances of the recusal motions.
*537 Appellant proceeds with an argument that the attorney general had abused the grand jury process. The application for convening a statewide grand jury was made by the attorney general on November 19, 1987. The grand jury returned Presentment No. 9 on February 17, 1989 which resulted in a 30-count information charging appellant with criminal misconduct. The allegation of abuse by the attorney general is that the grand jury was convened to investigate organized crime and public corruption involving more than one county of the Commonwealth and involving gambling, bookmaking, pool selling, prostitution, vice related offenses and entrapment. O'Kicki argues that his alleged offenses involved none of these factors. As to the argument that there is a variance among the offenses actually charged and the Notice of Submission and the Application to Convene the Grand Jury, this argument has been made and answered in another case before the Supreme Court.
Petitioner contends that the grand jury's investigation into the fiscal affairs of the Funds is improper because the matter was not among the areas of criminal activity which were specifically enumerated by the district attorney in his application to empanel a grand jury. This contention, however, is premised upon a misreading of the Investigating Grand Jury Act, 42 Pa.C.S. § 4541 et seq. Whereas, the Act requires that any matter to be submitted to a grand jury be set forth in a notice of submission to the supervising judge, see 42 Pa.C.S. § 4550, the Act permits the empanelment of an investigating grand jury without specific reference to the criminal activity or activities to be investigated, see 42 Pa.C.S. § 4543(b); see generally Appeal of Washington, 490 Pa. 31, 415 A.2d 17 (1980). Indeed, if petitioner's interpretation of the Act were correct, whenever an investigating grand jury is in operation and additional criminal activity requiring grand jury resources becomes known, a new grand jury would have to be empaneled.
*538 In re County Investigating Grand Jury  Petition of Stout, 501 Pa. 118, 119-120, 460 A.2d 249, 250 (1983).
The argument that the application was improper since O'Kicki was the sole target of the grand jury inquiry, is made without support in the record. It is totally in error since 50 persons were charged as a result of the investigation of Notice Number 13.
Moreover, several of the counts which alleged criminal activities involved acts outside of Cambria County. Clearly, the predicate for convening a grand jury cannot be adjudged by hindsight viewed from the ultimate outcome of the proceedings but, must be determined from the perspective of the nature of the activities which, in good faith, are claimed to form a basis for the inquiry.
O'Kicki next makes an argument that does not appear to have been made before in the case, that the attorney general has improperly usurped the power of the district attorney of Cambria County. However, whether or not the prior approval for prosecution took place, See, 71 P.S. § 732-205, it is clear that the attorney general is empowered to investigate any criminal offense which it reasonably believes it is able to prosecute, Id.[4]; Commonwealth v. Goodman, 347 Pa.Super. 403, 415, 500 A.2d 1117, 1123 (1985).
Finally, under the prosecutional misconduct rubric, it is argued that the prosecuting attorney engaged in an impermissible argument when he stated in his closing argument "it also tells us something about how this case came into fruition and why the Commonwealth believes that it has proven a case, a case beyond a reasonable doubt against Joseph O'Kicki ..." Notes of Testimony at 5286.
*539 It is claimed that this is an improper assertion of personal belief in violation of the ABA Standards for Prosecutorial Conduct.
The claim is without merit for a number of reasons. The alleged improper argument as cited by appellant does not fully quote the words used by counsel which concluded, "a case beyond a reasonable doubt against Joseph O'Kicki on both these counts" (emphasis added words which were not included). It is important to note that the charges referred to in this argument were the "Interstate Fuel" charges. O'Kicki was found not guilty of these charges and hence the error, if any, was harmless. Also, the court, upon appellant's objection, gave a curative instruction. Finally, we do not believe the argument is improper since it merely asserts that the Commonwealth believes that "it has proven" a case against the defendant. This is not an expression of a personal belief of the prosecutor, but simply an encapsulation of the gist of what is, after all, the primary aim and focus of the government's purpose and the obligation it assumes when it takes on the burden of bringing criminal charges against a defendant.
Relative to this issue, we have said:
A prosecutor is permitted to draw reasonable inferences to the jury's attention as long as the implications are firmly rooted in the evidence presented and not in personal opinion. Therefore, not every improper remark by a district attorney is reversible error. The remarks must prejudice the jury so as to form a fixed bias and hostility in the minds of the jurors against the defendant so that they could not weigh the evidence and render a true verdict. Commonwealth v. Green, 251 Pa.Super. 318, 380 A.2d 798 (1977).
Commonwealth v. Woods, 275 Pa.Super. 392, 404-405, 418 A.2d 1346, 1352 (1980).
It is apparent that the argument of counsel was not improper so as to find any prosecutorial misconduct overreaching.
*540 Whether viewed separately or, as appellant would have it, cumulatively, for the above stated reasons, we see no basis for relief on the basis of alleged prosecutorial misconduct.
The next argument is that Count I of the information charging official oppression is violative of Pa.R.Crim.P. 228(a) and Commonwealth v. Baranyai, 278 Pa.Super. 83, 419 A.2d 1368 (1980), and that the conviction thereunder should be arrested. An examination of Count I of the criminal complaint reveals that it contains an opening paragraph in which it is charged that appellant has violated the terms of the act by a recitation of the language of the act. Thereafter, in 20 separate sub-paragraphs specific acts are described in detail giving the dates and circumstances thereof and the person(s) involved. The jury found appellant guilty of seven acts of official oppression and not guilty of two. He was given a single sentence of not less than one to not more than two years of incarceration and a fine.
The Baranyai case is inapposite. In that case the information charging official oppression simply contained the names of sixteen persons who were alleged victims of official oppression. The court found that such lack of specificity ran afoul of authorities which require that the information contain sufficient factual allegations so that a defendant is advised of the essential elements of the offense, so that he has notification of the charges he must meet. The detail of the instant information and the jury's specific verdict as to the various sub-counts demonstrate that the lack of specific notice condemned in Baranyai is not present in this case.
The next issue is the claim that there was an inconsistency between the testimony of Commonwealth witnesses George Koban and Brenda Nasser concerning the transfer of money in regard to the bribery charge. It is axiomatic, however, that it is within the province of jurors to believe all, part or none of the evidence as they deem appropriate when there is a conflict in the evidence. Commonwealth v. Feflie, 398 Pa.Super. 622, 581 A.2d 636 *541 (1990). If we view appellant's present argument as being that the evidence is insufficient to support the verdict, it must also fail since reviewing the evidence under this familiar principle of law it is clear that the evidence is fully sufficient to support the verdict of guilty of bribery.
O'Kicki complains that the court erred in permitting evidence of a so-called tacit admission. The evidence from James McNulty, Clerk of Courts, was that he reported to appellant that George Koban had publicly stated that he had paid Judge O'Kicki $500 for a job, but that the judge reneged on the deal. As Clerk of Courts, McNulty felt that he should report this to Judge O'Kicki and therefore he made an appointment to see him and after telling him of Koban's statement, he observed "no reaction whatsoever from Judge O'Kicki."
The court permitted the evidence. This is a proper application of the rule of evidence stated in Commonwealth v. Bolish, 381 Pa. 500, 113 A.2d 464 (1955):
"The rule of evidence is well established that, when a statement made in the presence and hearing of a person if incriminating in character and naturally calls for a denial but is not challenged or contradicted by the accused although he has opportunity and liberty to speak, the statement and the fact of his failure to deny it are admissible in evidence as an implied admission of the truth of the charges thus made. The justification of this rule is to be sought in the age-long experience of mankind that ordinarily an innocent person will spontaneously repel false accusations against him, and that a failure to do so is therefore some indication of guilt."
Id., 381 Pa. at 523, 113 A.2d at 476, quoting, Commonwealth v. Vallone, 347 Pa. 419, 421-422, 32 A.2d 889, 890 (1943).
The fact that the accusation report was not made to a law enforcement agent is inconsequential. See Commonwealth v. Faraci, 319 Pa.Super. 416, 466 A.2d 228 (1983). Finally, we observe that in his charge Judge Grifo left it to the jury to decide, "If you find that the silence ... occurred under *542 circumstances that would have brought a denial from an innocent person," (the jury could then consider the failure to respond as an admission).
Appellant charges error in excluding proffered defense evidence relative to signing auto purchase agreements in blank at dealings with Black Motors. This evidence was to be corrobative with O'Kicki's position that when he purchased a car from Black Motors, he was required to sign the agreement in blank. Appellant proferred the evidence of two witnesses, who happened to be father and son, to show the practice of Black Motors. There are significant differences: 1) the other transactions were 2 years previous to the O'Kicki transaction; 2) the transactions took place with a Black Motors representative who was deceased at the time of trial and who was a different person from the witness in Judge O'Kicki's case; 3) the principal case of the two involved a detailed history which culminated in a lawsuit. Given the wide discretion accorded the trial judge in the admission or rejection of such evidence, we are constrained to find no error in the court's ruling. See Roney v. Clearfield County Grange Mutual Fire Insurance Company, 332 Pa. 447, 3 A.2d 365 (1939); Johns v. Castellucci, 264 Pa.Super. 591, 401 A.2d 753 (1979); Caulfield v. Aetna Life Insurance, 144 Pa.Super. 257, 19 A.2d 575 (1941).
We now consider the claim that the official oppression offenses as they related to Brenda Nassar and Betty Krisko, were barred by the statute of limitations. When we analyze the applicable statutes and the evidence, we find that there is no merit to appellant's argument.
In 1978 the general statute of limitations applicable to the offense was two years with the exception that if the period had expired, the period was extended to the period while the alleged perpetrator is still in public office or employment, but in no case is the statute extended by more than three years. Effective December 1978, the exception was enlarged to the time of occupancy of office or employment or within five years thereafter, but not beyond eight years. Therefore, an offense with a two year statute of *543 limitation where the alleged actor continued to occupy public office, the maximum time for commencement of prosecution is ten years (two plus eight) 42 Pa.C.S.A. § 5552(c)(2). Instantly, the prosecution commenced on March 31, 1989 and the evidence was limited to acts after April 1, 1979, and were therefore within a 10 year limitation. Moreover, as the offenses under the evidence took place after April 1, 1979, the amendments to the statute of limitation provision, 42 Pa.C.S.A. § 5552, which were effective in 1978 are applicable. Finally, the argument that the limitations extension is inapplicable since the offenses were done in a private, not public, capacity is without merit since the extension applies to offenses which are committed by a public official "in the course of" his office and when in public office. 42 Pa. C.S.A. § 5552(c)(2).
By way of excerpting a brief and somewhat vague portion of the testimony of Ralph Horner, appellant argues that there was a failure to fix a time of offense with respect to the allegation of official oppression related to the threat to jail Mr. Horner after discovery of an illegal water connection. Horner, who was secretary and enforcement officer of the East Taylor Municipal Authority, discovered an illegal water tap on property owned by O'Kicki and stated that after he turned the water supply off he received a call from Judge O'Kicki threatening him with jail. Horner testified that the call from O'Kicki came after he shut off the water a second time in November, 1985. He also stated that he turned the water back on on December 4, 1985. Since the threat was between those dates, it gave appellant sufficient notice within a limited time frame so that he could not reasonably claim to be confounded in his defense.
Conviction on Counts six and seven, which relate to bribery, are challenged on a sufficiency of the evidence basis. Count six concerns O'Kicki's request to an attorney, Richard Green, for a percentage of the verdict in a jury case that he had presided over. It is alleged that since Green initially considered this a matter of a joke, it could not be seriously considered as a bribe sufficient for jury consideration. *544 However, Green thought the approach by O'Kicki serious enough that he reported it for advice to Judge Abood, another judge from Cambria County. It is also pertinent that several days later, when the post verdict order came down from Judge O'Kicki, it included an additional $100,000 in attempted avoidance damages under the Eminent Domain Code. Attorney Green had not sought this additional item of damages and indeed stated at trial:
A. Frankly, I'm ... I looked it up at the time this came down. I had never used it. In fact, didn't know it existed.
There was no insufficiency of the evidence as to this charge.
Similarly, it is argued that Laurel Bank lowered O'Kicki's interest rate on a loan from 18% to 11% as a settlement of a business dispute rather than as a result of a bribery by O'Kicki. Paul Kane, President of Laurel Bank, authorized and directed the loan rate reduction. He was subjected to exhaustive examination which included the following concerning his reaction to a letter sent to the bank by Judge O'Kicki:
BY MR. CLAUS:
Q. As you look at Exhibit No. 10, I would ask you to read Paragraph No. 3.
A. Which is the last paragraph?
Q. Yes, sir.
A. "Perhaps if my personal matters can be resolved with Laurel Bank in the near future, I may be inclined to reconsider your request for amicus curiae intervention on behalf of the trust department. Very truly, Joseph  Judge Joseph F. O'Kicki."
Q. Do you recall when you read that at the first time, sir?
A. Ah, yes.
Q. When would that have been?

*545 A. Well, it would have been on January the 11th, or a day afterwards, depending on when we received it. It was within a day of the date of the letter I believe.
Q. All right. Did you make the decision affecting the O'Kicki auto loan before or after that date?
A. That was done later.
Q. At the time you made that decision, did you consider the contents of that paragraph?
A. Yes.
Q. In what way?
MR. YELOVICH: I object.
THE COURT: Overruled.
THE WITNESS: Well, the Judge came in and told me that he was prepared to do, and I felt it would resolve the issue and I wanted to get it out of the way, so I made a business decision and I took his offer.
Q. And what was your response, sir?
MR. GALLOWAY: And I object, Your Honor, to that.
THE COURT: Yes. Overruled.
THE WITNESS: I should go ahead, sir?
THE COURT: Go ahead.
THE WITNESS: Answer, "I think there was a certain element of pressure on me, yes, sir."
BY MR. CLAUS.
Q. Sir, what was the basis on that  or for that pressure that you felt at that time?
A. Well, I think we're going back to this second paragraph here 
Q. Yes, sir.
A.  which gave me concern for the future dealings of our trust department.
Q. In what way, sir?
A. It indicates here he's not inclined to extend himself as far as any factors are concerned, and since the trust department had to deal through the Orphan's Court in many of its affairs, it would cause me concern to have an adversarial position established.
*546 We have reviewed the extensive testimony as it relates to the above two issues of sufficiency of the evidence. Viewing the evidence from this long established standard of review, see, e.g., Commonwealth v. Carroll, 510 Pa. 299, 507 A.2d 819 (1986), we conclude that there is no merit to appellant's insufficiency of the evidence arguments as to these bribery convictions.
O'Kicki was charged inter alia, with official oppression.
§ 5301. Official oppression
A person acting or purporting to act in an official capacity or taking advantage of such actual or purported capacity commits a misdemeanor of the second degree if, knowing that his conduct is illegal, he:
(1) subjects another to arrest, detention, search, seizure, mistreatment, dispossession, assessment, lien or other infringement of personal or property rights; or
(2) denies or impedes another in the exercise or enjoyment of any right, privilege, power or immunity.
18 Pa.C.S.A. § 5301.
In the course of his charge, the court related the allegations of criminal misconduct to the words of the statute using the terms "unlawful mistreatment", "dispossession", "other infringement" "of property rights", "unlawfully impeded ... in the exercise or enjoyment of right, privilege, power or immunity."
The court also charged:
You may consider the following. Mistreatment means to treat badly, and is not limited to physical abuse alone, but can include mental abuse and stress. Dispossession means to put out of possession or ownership. Assessment means to subject one to a levy or a charge; and lien means to charge upon real estate or personal property of a person.
In Commonwealth v. Checca, 341 Pa.Super. 480, 491 A.2d 1358 (1985) there was a challenge to the word "mistreatment" in the instant statute as being unconstitutionally vague. We disagreed and opined, "Examining the challenged *547 statute in the light of the conduct with which appellant was charged, we find that appellant should reasonably have understood that his actions were proscribed by the statutory prohibition against `mistreatment'", Id., 341 Pa.Superior Ct. at 498, 491 A.2d at 1367. Similarly, we conclude that the phrases used in the court's charge here were, without further attempt at definition, sufficient to apprise the jury when related to the evidence of the nature of the crime of official oppression. The words and phrases involved have plain meanings and are easily understood by laymen. There is no error in the charge.
Appellant claims error in the court's refusing to sustain an objection to the admission of a letter written by O'Kicki to a vice-president of the United States National Bank which was admitted as Exhibit 83. In the letter O'Kicki sought a loan reduction. The text of the letter by O'Kicki which was read into evidence was:
Mr.  it's, "Dear Mr. Wallace, on December 2, 1982, after having made contact with the Carolltown office of the United States National Bank, I purchased the above captioned mobile home and had it financed here in the Edenburg office of the United States National Bank.
"At that time it was represented to me that the debt against the home was approximately $9700.00 and that it was ready for immediate occupancy and was habitable. The home was delivered approximately a week later and placed upon the pad. Winter weather set in and a closer examination was not made, except that the front lock was missing. The unit was immediately sealed.
"As soon as the weather broke, we proceeded to make the home available for living purposes. It was then that we discovered that all the plumbing had been either removed or broken. The furnace motor was nonfunctional. The roof had a large leak, and the plaster board had come down in the bedroom and hallways. In plain words, the home was a real mess and was a mess at the time of purchase.

*548 "In view of the fact that I can believe  in view of the fact that I believe that the warranty of habitability was grievously breached in this case and that the habitability was not possible until August 1983, I strongly suggest that we negotiate a reduction in the purchase price.
"To verify the condition of this habitable home, I had Mr. Wilson, the manager of the Ebensburg branch:  and that's of United States National Bank  "visit the home with me last July." He can verify the condition that the home was in after I had substantially cleaned it and improved it. The present balance on the home is approximately $6,000.00. I ask that this balance be reduced to $3,000.00. Very truly yours, Joseph F. O'Kicki."
Carbon copy to John Wilson, manager, U.S. National Bank of Ebensburg.
Although there was no contention that the letter itself was the basis of any criminal misconduct, the Commonwealth argues that it was relevant to the claim that O'Kicki used his office to obtain a special consideration as in the charge of bribery of Laurel Bank and criminal coercion of Laurel Bank.
The admission of this testimony was within the discretion of the trial court. Similar documents may properly be considered in support of the intention of an actor in the transaction at issue. See Estate of Ciaffoni, 498 Pa. 267, 446 A.2d 225 (1982).
We reach the same conclusion as to the following issue. There was evidence that Betty Krisko "kicked back" to O'Kicki one half of a retroactive pay increase she received in 1977. This was relevant to the Koban incident wherein appellant was convicted of soliciting $500 from George Koban for securing a job promotion in 1979.
In this instance it is important to note that the area was opened by defense counsel in cross-examination of the witness where she was asked if O'Kicki ever "subjected you to assessments or a lien" (at the time counsel was questioning the witness as to the litany of illegal acts which one in an *549 official capacity may inflict upon another in violation of the official oppression statute 18 Pa.C.S.A. 5301). This question, which resulted in a "no" answer, made relevant the testimony on redirect covering the kickback arrangement.
As to sentencing, the court below refused to modify its order that O'Kicki make restitution to the Commonwealth for all wages received by him from the date of his suspension from judicial office. Appellant relies on the language of the Sentencing Code, 42 Pa.C.S.A. § 9721(c), and the Crimes Code, 18 Pa.C.S.A. § 1106, to argue that restitution may only be awarded to a "victim" and that the Commonwealth suffered no pecuniary loss as a result of any of the specific crimes of which O'Kicki was convicted. The Commonwealth, on the other hand, argues that by accepting his salary since his suspension, O'Kicki has made the state a victim by receiving money while unable to discharge his duties. In Commonwealth v. Mourar, 349 Pa.Super. 583, 504 A.2d 197 (1986) the court decided that a governmental entity may be a victim of a crime under the Pennsylvania restitution law. The court held that it was proper to award restitution to drug enforcement agencies in order to reimburse them for money paid for illegal goods in the form of drugs. Based on this authority and the fact that in this case we have a situation where, reduced to its simplest terms, the Commonwealth has paid dollars for work not done, we affirm the award of restitution.[5]
Further, as to his sentence, appellant contended that he has received improper multiple sentences for crimes based upon identical facts. Thus, it is argued that the George Koban better job fee should only have been the basis for a single sentence rather than three; that the Richard Green verdict fee case could not properly be the foundation for 2 sentences; and that the Laurel Bank matter was also improperly subjected to double sentencing.
*550 The confusion in Pennsylvania law with respect to merger of offenses underwent a major attempt at solution in Commonwealth v. Williams, 521 Pa. 556, 559 A.2d 25 (1989) which abolished the doctrine in Pennsylvania in all matters except for lesser included offenses. See also, Commonwealth v. Mobley, 399 Pa.Super. 108, 581 A.2d 949 (1990). Appellant makes no argument that any of his convictions were for lesser included offenses of other convictions.
Appellant mounts two challenges to the discretionary aspects of his sentence: 1) that the fines totalling $57,500 were improperly levied since there was no inquiry into his ability to pay, or the burden the fines will create and, 2) that the court failed to give an adequate statement of reasons for the sentence.
Appellant has failed to include in his brief a concise statement of the reasons relied upon for allowance of appeal. Pa.R.A.P. 2119(f); Commonwealth v. Tuladziecki, 513 Pa. 508, 522 A.2d 17 (1987). Since the Commonwealth has appropriately objected to this omission, Commonwealth v. Krum, 367 Pa.Super 511, 533 A.2d 134 (1987), these issues are waived.
Lastly, appellant challenges the charges against him grounded on a violation of the Liquor Code for maintaining an interest in a local beer distributorship. This issue relates to charges severed from the charges now on appeal and awaiting trial. The present appeal on this issue is interlocutory. 42 Pa.C.S.A. § 742 and the appeal on this issue is dismissed.
Judgment of sentence affirmed.
JOHNSON, J., filed a concurring and dissenting opinion.
JOHNSON, Justice, concurring and dissenting.
Two separate appeals have been brought by Joseph F. O'Kicki. The first appeal is from the judgment of sentence entered June 27, 1990, and docketed at No. 1113 Pittsburgh, 1990. The second appeal is from an order entered August 30, 1990, and docketed at No. 1554 Pittsburgh, 1990. I join *551 in so much of my colleagues' action as would affirm the terms of concurrent incarceration and the imposition of cumulative fines upon guilty verdicts on Counts I, III, IV, VI, VII, and VIII.
I would reverse so much of the judgment of sentence as purports to direct restitution "to the Commonwealth for all wages received by you since the date of your suspension from the judicial office." Sentencing Hearing Transcript, June 27, 1990, page 48.
In addition, I would reverse the entire order entered August 30, 1990 which purports to assess costs and restitution due the Commonwealth as being without authorization in law. I, therefore, must concur and dissent.
O'Kicki was tried between October 30, 1989, when jury selection began, and December 16, 1989 when the verdict was returned. Post-trial motions were filed in December 1989. A hearing was held late that month on O'Kicki's allegation of a lack of unanimity of the verdict. By opinions and orders entered during March and June 1990, all post-trial motions were denied.
A complete sentencing hearing was held on June 27, 1990. O'Kicki was sentenced to undergo imprisonment of two to five years and to pay fines totalling $57,500. From this judgment of sentence, O'Kicki perfected an appeal on July 16, 1990 following the denial of his motion to modify sentence.
The Commonwealth provides no convincing support for its having proceeded to a hearing on its own costs almost sixty days after the imposition of sentence and more than one month after the appeal from judgment of sentence had been perfected. Strangely, it cites to the Pennsylvania Rules of Appellate Procedure as the source of the jurisdiction for the hearing held August 20, 1990. In attempting to find support in Pa.R.A.P. 1701(b)(1), the Commonwealth argues:
As a result, when the court held the costs hearing on August 20, 1990, it was merely, "taking such action as *552 was necessary to preserve the status quo." The court was merely assigning a dollar amount to the costs imposed on O'Kicki. The court was not moving forward or "proceeding further" with the case at bar. Rather, it was merely filling in a blank which was intentionally left by the court on June 27, 1990.
Brief for Appellee (1554 Pittsburgh 1990), pages 13-14. As of June 27, 1990, O'Kicki had been fined a cumulative sum of $57,500. As a direct result of the hearing held August 20, 1990, the August 30th order was entered which increased O'Kicki's liability by the sum of $104,158.62 for Commonwealth costs and expenses and an additional $144,909.75 by way of ordered restitution. For the Commonwealth to argue that this imposition of nearly a quarter million dollars of increased liability was nothing more than "preserving the status quo" or "merely filling in a blank" borders on the insulting.
Neither party has referred to 42 Pa.C.S. § 5505 which limits the time within which a trial court may modify or rescind an order to thirty days after entry, where no appeal has been taken. Here, we have an appeal from judgment of sentence which was taken in a timely fashion on July 16, 1990. The trial court has not filed any opinion or memorandum in support of its order of August 30, 1990. While the mathematics of the order may seem to be self-explanatory, there is no explanation as to how the trial court considered, and resolved, the numerous objections advanced by counsel for O'Kicki throughout the August 20th hearing. See Pa. R.A.P. 1925(a).
I would conclude that the sentencing court lost its jurisdiction to proceed further on costs or restitution on July 16, 1990 when an appeal was taken from the sentencing order, or on July 27, 1990 at the very latest. A trial court lacks jurisdiction to modify a sentence after the expiration of the thirty-day restriction imposed by 42 Pa.C.S. § 5505, and any attempt to modify the sentence thereafter is a nullity. Commonwealth v. Lynch, 304 Pa.Super. 248, 251, 450 A.2d 664, 666 (1982); Commonwealth v. Canady, 297 Pa.Super. *553 292, 296-97, 443 A.2d 843, 845 (1982); accord Municipal Council of Monroeville v. Kluko, 102 Pa.Cmwlth.Ct. 49, 52-54, 517 A.2d 223, 225 (1986).
Moreover, I believe that a separate but equally controlling reason exists for the reversal of the August 30th order. Costs must not be assessed except as authorized by law. Commonwealth v. Gill, 288 Pa.Super. 538, 544, 432 A.2d 1001, 1004 (1981). The burden of justifying, by a preponderance of the evidence, costs imposed upon a defendant rests upon the Commonwealth. Id. In this prosecution, the Commonwealth has fallen far short of either arguing or producing statutory support for reimbursement for the expenses here at issue.
The Commonwealth argues that "[s]ince the Commonwealth was represented by the Office of the Attorney General with all the powers and subject to all the liabilities of district attorneys, the court properly assessed costs against O'Kicki." Brief for Appellee (1554 Pittsburgh 1990), Summary of Argument, page 10. I must vigorously disagree.
During the hearing on the assessment of costs and restitution held August 20, 1990, Deputy Attorney General Lawrence N. Claus alluded, more than once, to the Commonwealth Attorneys Act, Act of October 15, 1980, P.L. 950, No. 164, §§ 101 to 506, 71 P.S. §§ 732-101 to 732-506, seemingly to support his belief that statutory authorization existed for the proceeding then underway. The following exchange occurred during closing argument following the costs assessment proceedings:
ATTORNEY CLAUS: Your Honor, the only thing that is different in this case is the attorney is the Attorney General. That is not a distinction of substance, especially since the Commonwealth Attorneys Act and the rules of court that have been specifically promulgated to say that in any statute or any ruling where it speaks of a D.A., it also means attorney for Commonwealth. which also means the Office of Attorney General.
THE COURT: And that statute is 16 P.S. ___?

*554 ATTORNEY CLAUS: 1403, Your Honor.
THE COURT: 1403. Okay.
ATTORNEY CLAUS: That's right. And we're talking about costs of prosecution. Your Honor, both the Commonwealth Attorneys Act and the Judicial Code with the Grand Jury Act envision that a county not be required to bear the costs of a case just like this.
Hearing on Costs, Excerpt of Proceedings, August 20, 1990, filed August 27, 1990, pages 6-7. Nowhere in the Excerpt of Proceedings (14 pages), or in the Proceedings of the same date filed November 15, 1990 (137 pages), does the Commonwealth declare exactly which section or sections of the Commonwealth Attorneys Act are relevant, or controlling, on the issues on this prosecution.
In its Brief for Appellee (1554 Pittsburgh 1990), the only reference to the Commonwealth Attorneys Act is to § 205 of the Act, 71 P.S. § 732-205, appearing at pages 19-20 of the Brief. To the extent that the Commonwealth urges subsections (a) and (b), there is no disagreement since the authority of the Attorney General to prosecute O'Kicki is not disputed. However, the Commonwealth's attempt to rely on subsection (d) to support its attempted reimbursement of costs is clearly misplaced. Not only has the representative of the Commonwealth misinterpreted the first portion of the subsection, relating to the powers of special deputies, but it has failed to disclose to this tribunal the concluding sentence in the subsection which is directly adverse to the position of the Commonwealth and not disclosed in O'Kicki's brief. See Rules of Professional Conduct, Rule 3.3(a)(3).
In pertinent part, § 205 of the Act provides:
§ 732-205. Criminal prosecutions
.....
(d) Powers when prosecuting.  Whenever the Attorney General prosecutes a criminal action, or appeal, he [sic] may employ such special deputies as are necessary for that purpose; such deputies shall take the oath of *555 office and be clothed with all the powers, and subject to all the liabilities imposed by law upon district attorneys, including the power to sign informations or indictments. Whenever the Attorney General intervenes in a criminal action, the costs incurred as a result of the intervention shall be paid by the Commonwealth.

71 P.S. § 732-205(d) (emphasis added).
Both of the sentences appearing in § 205(d) are very clear. When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit. 1 Pa.C.S. § 1921(b). The first sentence in the section does nothing more than vest in special deputies the same powers and obligations of district attorneys when those special deputies have been employed by the Attorney General in a criminal prosecution. It does not, as the Attorney General seeks to argue in his Brief, at page 20, vest in the Attorney General the entitlement to recover the costs of prosecution and investigation.
On the contrary, the subsection makes it absolutely clear that it is the Commonwealth that shall be responsible for any and all costs incurred as a result of the Attorney General's intervention. The subsection is silent as to regular costs and cannot be read as implying anything whatsoever concerning those costs. I must conclude, therefore, that the Attorney General must look elsewhere than in the Commonwealth Attorneys Act if the costs sought to be imposed upon O'Kicki following the August 20th hearing are to be justified.
The prosecution of O'Kicki had its genesis in Presentment No. 9 of the Sixth Statewide Investigating Grand Jury, returned February 17, 1989. A statewide investigating grand jury is encompassed under, and included in, the statutory term, "multicounty investigating grand jury." 42 Pa.C.S. § 4542. Definitions.
In 1984, the legislature passed and the Governor signed two nearly identical amendments to that portion of Act 142 of 1980 which had added Subchapter D to Chapter 45 of *556 Title 42, the Investigating Grand Jury Act, 42 Pa.C.S. §§ 4541-4553. As amended, § 4553 now provides:
§ 4553. Expenses of investigating grand juries and trials resulting therefrom
(a) County.  ....
(b) Multicounty.  The expenses of any multicounty investigating grand jury shall be borne by the Commonwealth. In addition, the costs and expenses resulting from any trial of a person against whom a presentment has been issued by a multicounty investigating grand jury shall be borne by the Commonwealth. Costs and expenses under this subsection include, but are not limited to, all reasonable costs incurred by the county for the services of the courts, the trial jury, the sheriff, the clerk of courts, the county prison, the district attorney and any public defender appointed by the court, and related costs and expenses incurred by the county in the course of the trial. Counties shall be reimbursed from the General Fund of the Commonwealth upon application to the State Treasurer through the Office of Attorney General pursuant to procedures prescribed by that office.
42 Pa.C.S. § 4553 (emphasis added). The plain language of the 1984 amendment(s) to the Investigating Grand Jury Act makes it clear that the Commonwealth must pay all expenses arising from the O'Kicki trial, for the very simple reason that the trial stemmed from the presentment of the multicounty investigating grand jury.
The Commonwealth has as much as conceded this, since it did not file its Petition for Assessment of Costs of Prosecution (filed June 19, 1990) until after having reimbursed Cambria County for all of its costs  at that time  arising from the O'Kicki trial. See Petition for Assessment etc., Exhibit No. 2, (authorizing memorandum for payment of $42,532.08 to Cambria County). The testimony of Albert M. Penska, Jr. that the county had been reimbursed for all of its costs is undisputed. Hearing on Costs, August 20, 1990, pages 36-37.
*557 On this appeal, Cambria County is not seeking to recover any of its expenses in connection with the prosecution of O'Kicki. It has already been paid in full, pursuant to the Act.
What we are faced with on this appeal is the Commonwealth's attempt, for the first time, and without support in the case law, to avoid the legislature's unambiguous declaration of policy that all expenses resulting from O'Kicki's trial be borne by the Commonwealth. 42 Pa.C.S. § 4553(b), supra.
In its formal Petition for Assessment of Costs of Prosecution filed June 19, 1990, and again in its Supplemental Petition for Assessment of Costs of Prosecution and Establishment of Restitution filed August 15, 1990, the Attorney General cites only to 42 Pa.C.S. § 1726 and 16 P.S. § 1403 as its authority to request the trial court to impose these costs on the defendant. 42 Pa.C.S. § 1726 does nothing more than vest in the Supreme Court, as governing authority (see 42 Pa.C.S. § 102, Definitions), the power to prescribe by general rule the standards governing the imposition and taxation of costs. The costs referred to in § 1726 are those to be collected from the public, and not official expense reimbursement. Predictably, there is no reference to § 1726 in the Attorney General's briefs.
As to 16 P.S. § 1403, I find no support for the position of the Attorney General in that section. It provides, in its entirety:
§ 1403. Expenses incurred by District Attorney
All necessary expenses incurred by the district attorney or his assistants or any officer directed by him in the investigation of crime and the apprehension and prosecution of persons charged with or suspected of the commission of crime, upon approval thereof by the district attorney and the court, shall be paid by the county from the general fund of the county. In any case where a defendant is convicted and sentenced to pay the costs of prosecution and trial, the expenses of the district attorney *558 in connection with such prosecution shall be considered a part of the costs of the case and be paid by the defendant.
16 P.S. § 1403.
Under the first sentence of § 1403, Cambria County has already paid the district attorney's expenses and has been reimbursed by the Commonwealth. The second sentence of the section, purporting to require the payment by the defendant, is clearly overridden by the 1984 amendment to the Investigating Grand Jury Act, supra. The requirement that the Commonwealth bear the expenses resulting from any trial of a person against whom a multicounty investigating grand jury presentment has been issued (as found in 42 Pa.C.S. § 4553) is irreconcilable with the requirement that the defendant pay the costs of the district attorney (as found in 16 P.S. § 1403). The 1984 amendment to § 4553 expressly includes "all reasonable costs incurred by ... the district attorney." § 4553 as amended in 1984 is later in date to 16 P.S. § 1403, the County Code, Act of August 9, 1955, P.L. 323, § 1403. Therefore, the statute later in date of final enactment, that is, 42 Pa.C.S. § 4553 must prevail. 1 Pa.C.S. § 1936.
At the cost hearing on August 20, 1990, the Attorney General presented the testimony of four county officers and one other county employee for the purpose of proving the Commonwealth's costs and expenses. The Controller, the Treasurer, the Clerk of Courts and the Sheriff all testified, as did a clerk in the Clerk of Courts' office responsible for keeping track of jury selection. However, O'Kicki has not challenged the accuracy of the dollar amounts claimed. His position, with which I agree, is simply that no statute exists providing for the recovery of costs by the State Police or the Office of the Attorney General.
In his August 30, 1990 order, the Honorable Richard D. Grifo ordered O'Kicki to pay $84,338.05 to the Office of the Attorney General. This amount reflected:

 Preliminary Hearing and Trial $14,645.73
 Cost of Trial Transcript Copy 8,664.00
 Grand Jury Witness Expenses 7,010.65
 Reimbursement to Cambria County 54,017.67

*559 Judge Grifo also ordered O'Kicki to pay $19,820.57 to the State Police through the Cambria County Clerk of Courts. This total sum represented expenditures, subsistence and overtime for two State Police troopers.
All of these costs and expenses are either expressly set forth or included by implication in 42 Pa.C.S. § 4553(b) and are to be borne by the Commonwealth, since all of them result from the trial of a person against whom a multicounty investigating grand jury presentment had been made. No statutory authority exists to shift these costs and expenses away from the Commonwealth and on to a hapless defendant.
I would find that the court was without jurisdiction to impose further costs on August 30, 1990. 42 Pa.C.S. § 5505. Commonwealth v. Lynch, supra, Commonwealth v. Canady, supra. Independent of that finding, I can find no authority to permit the Commonwealth to avoid its obligation to bear the expenses of this trial which stemmed from a multicounty investigating grand jury presentment as mandated by 42 Pa.C.S. § 4553(b). Commonwealth v. Gill, supra; Commonwealth v. Houck, 233 Pa.Super. 512, 335 A.2d 389 (1975). I therefore do not reach, or consider, O'Kicki's third issue at No. 1554 Pittsburgh 1990, raising substantive questions relating to the necessity and reasonableness of some of the expenses, the amounts properly attributable to counts upon which O'Kicki was convicted, and the manner of calculation of the costs.
Turning to those portions of the two orders on appeal which direct O'Kicki to make restitution, I must again depart from the position of my distinguished colleagues. The Commonwealth correctly points out that a case remains pending before our Supreme Court which addresses one of the very issues on this appeal: Whether government agencies can be included within the definition of "victim" under the restitution statute found in the Crimes Code, 18 Pa.C,S. § 1106(h). The history of that case, Commonwealth v. Mourar, 522 Pa. 574, 559 A.2d 36 (1989, Table), (56 Eastern District 1989, argued December 11, 1989), is set forth by the *560 Commonwealth in its brief, page 29 n. 6 and will not be repeated here.
Restitution can only be ordered as provided by statute. The statutory authority for imposing restitution as a direct sentence is found in 42 Pa.C.S. § 9721(c) and 18 Pa.C.S. § 1106. The former provides:
§ 9721. Sentencing generally
....
(c) Restituion.  In addition to the alternatives set forth in subsection (a) of this section the court may order the defendant to compensate the victim of his criminal conduct for the damage or injury that he sustained.
The latter, in pertinent part, provides:
§ 1106. Restitution for injuries to person or property
(a) General rule.  Upon conviction for any crime wherein property has been stolen, coverted or otherwise unlawfully obtained, or its value substantially decreased as a direct result of the crime, or wherein the victim suffered personal injury directly resulting from the crime, the offender may be sentenced to make restitution in addition to the punishment prescribed therefor.
....
(h) Definitions.  As used in this section the following words and phrases shall have the meanings given to them in this subsection:
....
"Restitution." The return of the property of the victim or payments in cash or the equivalent thereof pursuant to an order of the court.
"Victim." Any person, except an offender, who suffered injuries to his person or property as a direct result of the crime.
O'Kicki was convicted of Official Oppression (Count I), Bribery (Count III), Demanding Property to Secure Employment (Count IV), Bribery (Counts VI and VII), and Criminal Coercion (Count VIII). While O'Kicki might arguably be liable for restitution to George Koban in the sum of $500, *561 related to Counts III and IV, that is not before us on this appeal. The trial court, at the behest of the Commonwealth, ordered O'Kicki to make restitution of $144,909.75 in its order entered August 30, 1990. That sum represented O'Kicki's accrued salary from October 11, 1988 (the date of suspension from judicial duties) through June 27, 1990 (the date of sentencing) and from June 27, 1990 through August 4, 1990 (most recent monthly payroll for common pleas court judges prior to August 20th hearing).
Under the general rule set forth in § 1106(a), supra, restitution is authorized only in convictions "wherein property has been stolen, coverted or otherwise unlawfully obtained, or its value substantially decreased as a direct result of the crime." The Attorney General seeks to argue in his brief (No. 1113 Pittsburgh 1990), pages 65-66, without citation to any authority, that O'Kicki's salary was "unlawfully obtained". The Attorney General contends:
O'Kicki was suspended after he was notified that he was a target of the grand jury's investigation. The suspension continued after charges were filed and during his prosecution for several charges all stemming from his abuse of his office as judge of the Court of Common Pleas for Cambria County. Therefore, his entire salary was obtained unlawfully and should be returned. O'Kicki was being paid while not performing his duties. Therefore, he obtained the salary unlawfully. As a matter of justice, the Commonwealth must be reimbursed for this money.
Brief for Appellee (No. 1113 Pittsburgh 1990), pages 65-66. The same argument is repeated, verbatim, in Brief for Appellee (No. 1554 Pittsburgh 1990), pages 28-29.
I know of no statute or caselaw which makes the receipt of one's paycheck a crime where the entity issuing the warrant for payment is fully apprised of the facts of suspension from duties and nevertheless issues the warrant. More fundamentally, the Attorney General must concede that the salary which O'Kicki received was neither stolen by him nor converted. I reject the suggestion that *562 the sums sought to be recovered here are within the intent of the general rule set forth in § 1106(a). See Commonwealth v. Mourar, 349 Pa.Super. 583, 606-609, 504 A.2d 197, 209-211 (Johnson, J., dissenting).
Moreover, we have held that restitution is permissible only as to losses flowing from the conduct for which the defendant has been held criminally accountable. Commonwealth v. Cooper, 319 Pa.Super. 351, 356, 466 A.2d 195, 197 (1983). This is because due process of law is denied when the losses for which restitution has been imposed did not arise from the very offense for which the defendant was convicted. There are entirely too many instances where employees  both in the public and private sector  receive salaries during periods of suspension for this writer to join with the Office of the Attorney General in its conclusion that salary received during a period of suspension becomes money "unlawfully obtained" under the restitution general rule simply because the employee has been excluded from performing duties on the direction of the governing authority.
Because I would conclude that the property for which restitution was ordered  in this case, salaries paid during a period of suspension  does not fit the general rule set forth in § 1106(a), I would find it unnecessary to proceed to a determination of whether the Commonwealth is, as the Attorney General contends, a "victim" as defined in § 1106(h). Also, because I find restitution to be wholly unauthorized on these facts, I do not consider whether the order of restitution in the amount of $144,909.75 is supported on the record. Commonwealth v. Torres, 396 Pa.Super. 573, 579 A.2d 398 (1990); Commonwealth v. Reed, 374 Pa.Super. 510, 543 A.2d 587 (1988).
Finally, I would note that our Supreme Court has recently denied a Petition to Implement Automatic Forfeiture of Judicial Office brought against the defendant in this case. In re: Judge Joseph F. O'Kicki, No. 153 J.I.R.B. Dkt., April 29, 1991. (Order suspending respondent without pay pending disposition of appeals; forfeiture of judicial office to *563 take effect automatically but not before exhaustion of appeal rights). Until the entry of the order at No. 153 J.I.R.B. Docket, O'Kicki continued to receive his salary with the knowledge of the governing authority. And it was the governing authority, and only the governing authority, that had the power to suspend O'Kicki from his duties, with or without pay. Pennsylvania Constitution, art. 5, § 18(g) and (h).
For all of the above reasons, I respectfully concur as to the imposition of incarceration and cumulative fines, and I dissent as to the attempted imposition of costs to be paid to the Office of the Attorney General and to the State Police. I would reverse both orders as to the attempt to order restitution to the Commonwealth and must therefore dissent to so much of my colleagues' opinion as finds that portion of the orders to be proper.
NOTES
[1] Post-trial, appellant filed a series of motions, all of which were denied by the trial judge, the Honorable Richard D. Grifo, S.J., on June 8, 1990. Judge Grifo's opinion covered all issues sought to be raised by appellant's motions, even though "the parties neither briefed nor argued a great many of the issues" (raised by defendant). By our count there were 132 issues raised and treated by the trial court in its opinion.
[2] This is the nomenclature used in the trial court.
[3] Our search of the record fails to disclose the original of these motions and we have relied on the copies attached to Defendant's Supplemental Omnibus Pre-trial Motions filed September 6, 1989. The lack of the original documents demonstrates the mischief which results from the regrettable practice of presenting papers for court consideration without having filed them of record.
[4] § 732-205 provides:

The attorney general shall have the power to prosecute in any county criminal court
(1) criminal charges against state officials ...
[5] Mourar is still pending before the Supreme Court on the issue of the grant of restitution to the government. 522 Pa. 574, 559 A.2d 36 (1989).